**ORIGINAL**

1  MARC T.G. DWORSKY (State Bar No. 157413)
   KATHERINE K. HUANG (State Bar No. 219798)
2  KRISTINA L. WILSON (State Bar No. 247829)
   MUNGER, TOLLES & OLSON LLP
3  355 South Grand Avenue
   Thirty-Fifth Floor
4  Los Angeles, CA 90071-1560
   Telephone:    (213) 683-9100
5  Facsimile:    (213) 687-3702
   Marc.Dworsky@mto.com
6  Katherine.Huang@mto.com
   Kristina.Wilson@mto.com
7
   Attorneys for Plaintiff
8  PLAINFIELD DIRECT INC. and
   CUNEO CAPITAL PARTNERS I LLC
9

**FILED**

JUL 2 5 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

10                UNITED STATES DISTRICT COURT

11            SOUTHERN DISTRICT OF CALIFORNIA

'08 CV 1350 LAB NLS

12

13  PLAINFIELD DIRECT INC., a Delaware
    corporation, and CUNEO CAPITAL
    PARTNERS I LLC, a Connecticut limited
14  liability company,

15                    Plaintiffs,

16         vs.

17  PENTA WATER COMPANY, INC., a
    California corporation,

18                    Defendant.

19

CASE NO. _____

COMPLAINT FOR BREACH OF
CONTRACT, OPEN BOOK ACCOUNT,
ACCOUNT STATED, AND MONEY LENT
OR PAID

20         Plaintiffs Plainfield Direct Inc. and Cuneo Capital Partners I LLC allege as

21  follows:

22                         **INTRODUCTION**

23         1.    Plaintiffs Plainfield Direct Inc. and Cuneo Capital Partners I LLC bring

24  this suit to enforce Defendant Penta Water Company, Inc.'s obligation to repay a $3,000,000

25  interest-bearing loan made pursuant to a Note Purchase Agreement.

26                           **PARTIES**

27         2.    Plaintiff Plainfield Direct Inc. is and was at all relevant times herein a

28

5585305.1

1   corporation organized under the laws of the State of Delaware, with its principal place of business

2   in Greenwich, Connecticut. Plaintiff Plainfield Direct Inc. is the successor-in-interest to

3   Plainfield Direct West II LLC. Plaintiff Plainfield Direct Inc. and Plainfield Direct West II LLC

4   shall be referred to herein, together and separately, as "Plainfield." Plainfield is an investment

5   capital management firm.

6          3.    Plaintiff Cuneo Capital Partners I LLC ("Cuneo Capital") is and was at all

7   relevant times herein a limited liability company organized under the laws of the State of

8   Connecticut, with its principal place of business in Connecticut. The members of Cuneo Capital

9   are F. Peter Cuneo, the Irrevocable Trust for the benefit of Gavin MacLeod Cuneo and his

10   descendants, and the Irrevocable Trust for the benefit of Colin Lyng Cuneo and his descendants.

11   Cuneo Capital is a citizen of Connecticut, New York, and New Jersey because F. Peter Cuneo is

12   an individual who is a citizen of Connecticut, and the trustees for the other two members of

13   Cuneo Capital are individuals who are citizens of New York and New Jersey. Pursuant to an

14   assignment and assumption agreement between Cuneo Capital and Plainfield, Cuneo Capital is

15   the assignee of 10% of Plainfield's rights and obligations under the Note Purchase Agreement at

16   issue in this case.

17          4.    Defendant Penta Water Company, Inc. ("Penta Water") is and was at all

18   relevant times herein a corporation organized under the laws of the State of California, with its

19   principal place of business in Carlsbad, California in San Diego County. Penta Water is in the

20   business of manufacturing and marketing premium water products with enhanced hydration and

21   purification characteristics. Penta Water entered into the contract that gives rise to the payment

22   obligations at issue in this lawsuit in California.

23                    **JURISDICTION AND VENUE**

24          5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

25   This civil action is between citizens of different states and the amount in controversy, exclusive

26   of interest and costs, exceeds $ 75,000.

27          6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) in that the

28   defendant resides in this district and is subject to personal jurisdiction in this district at the time

5585305.1                    - 2 -

1    the action is commenced.  Penta Water's principal place of business is in San Diego County.

2    Penta Water made the contract at issue in this lawsuit in San Diego County, and that contract was

3    to be performed in San Diego County.

4                              **GENERAL ALLEGATIONS**

5            7.      On or about June 28, 2007, Penta Water entered into a Note Purchase

6    Agreement (the "Agreement") with Plainfield.  A true and correct copy of the Agreement is

7    attached hereto as Exhibit A and is hereby incorporated by reference.  Unless otherwise indicated,

8    all capitalized terms used herein shall have the respective meanings ascribed to such terms in the

9    Agreement.

10           8.      Pursuant to the Agreement, Plainfield agreed to loan Penta Water an initial

11   amount of $3,000,000 upon Penta Water's request, followed by subsequent amounts of up to an

12   additional $3,000,000.  Penta Water agreed to repay any borrowed amounts, together with

13   interest, in accordance with the terms contained in the Agreement and in the 10% Senior

14   Unsecured Note (the "Note") payable to the order of Plainfield that Penta Water was required to

15   execute if it requested that a loan be made.

16           9.      Section 7.6 of the Agreement provides that the outstanding principal

17   amount of the Note shall bear interest until maturity at a fixed interest rate of 10% per annum, but

18   in no event to exceed the Highest Lawful Rate.  If Penta Water, at its discretion, elects not to

19   make any interest payment on the Note in cash, then such interest payment shall be payable in

20   kind and shall be added to the outstanding principal balance of each Note and any such amounts

21   so added shall thereafter, for all purposes, be deemed to be a part of the principal amount of such

22   Note.

23           10.     On or about July 3, 2007, Penta Water requested that Plainfield loan it

24   $3,000,000 pursuant to the Agreement.

25           11.     On or about July 5, 2007, Plainfield loaned Penta Water $3,000,000

26   pursuant to the Agreement.  Penta Water concurrently executed the Note as contemplated by the

27   Agreement.

28           12.     Thereafter, Cuneo Capital and Plainfield entered into an assignment and

5585305.1                                    - 3 -

                                                              COMPLAINT

1    assumption agreement, as authorized by and in accordance with the terms of the Agreement.

2    Pursuant to the assignment and assumption agreement, Cuneo Capital became the assignee of

3    10% of Plainfield's rights and obligations under the Agreement.  Penta Water thus became

4    obligated to repay $2,700,000, plus accrued interest, to Plainfield, and $300,000, plus accrued

5    interest, to Cuneo Capital.

6         13.    By December 2007, Events of Default under the Agreement had occurred.

7    For example, Penta Water failed to furnish to Plainfield and Cuneo Capital an annual budget for

8    the 2008 calendar year by December 1, 2007, as Penta Water was required to do under Section

9    10.1(l) of the Agreement.  This failure to comply with Section 10.1(l) constitutes an Event of

10   Default under Section 12(d) of the Agreement.

11        14.    Penta Water's Chief Executive Officer resigned in March 2008 and Chief

12   Financial Officer resigned in April 2008.  Their resignations gave rise to Material Adverse Effects

13   as defined in Schedule B of the Agreement, in that their resignations were material adverse

14   changes in, and had a material adverse effect on, the business, operations, condition, and

15   prospects of Penta Water.  These Material Adverse Effects constitutes further Events of Default

16   under Section 12(o) of the Agreement.

17        15.    Plainfield and Cuneo Capital are informed and believe, and based on such

18   information and belief allege, that Penta Water failed to maintain an adjusted consolidated

19   EBITDA, calculated for the immediately preceding 12 months, of at least $1,000,000 as of the

20   fiscal quarter ending March 31, 2008, as Penta Water was required to do under Section 11.22 of

21   the Agreement.  This failure to comply with Section 11.22 also constitutes an Event of Default

22   under Section 12(d) of the Agreement.

23        16.    Section 13 of the Agreement provides that if an Event of Default has

24   occurred, Plainfield may declare all outstanding loans to be immediately due and payable.  Upon

25   any Notes becoming due and payable under Section 13, such Notes will forthwith mature and the

26   entire unpaid principal amount of such Notes, plus (i) all accrued and unpaid interest thereon, and

27   (ii) all fees, expense reimbursements obligations and other obligations of Penta Water, shall all be

28   immediately due and payable, in each and every case without presentment, demand, protest or

1   further notice, all of which are waived.

2   17.     Section 7.8 of the Agreement further provides that if an Event of Default,

3   as defined in the Agreement, has occurred and is continuing, or if any principal of or interest on

4   any Note is not paid when due, whether at state maturity, upon acceleration or otherwise, then the

5   principal amount of the Note then outstanding, in the case of an Event of Default, and such

6   overdue amount, in the case of a failure to pay amounts when due, shall bear interest, after as well

7   as before judgment, at a fixed interest rate of 13% per annum, but in no event to exceed the

8   Highest Lawful Rate (the "Default Rate").

9   18.     On May 28, 2008, Plainfield provided written notice to Penta Water that

10   Penta Water's failure to comply with the terms of the Agreement constituted Events of Default,

11   and requested that Penta Water immediately repay to Plainfield and Cuneo Capital the loaned

12   amount of $3,000,000, together with the interest that has accrued since July 5, 2007 and continues

13   to accrue pursuant to the Agreement.

14   19.     Penta Water has not repaid the loaned amount of $3,000,000 or the interest

15   that has accrued and continues to accrue pursuant to the Agreement.

16   **FIRST CAUSE OF ACTION**

17   **(Breach of Contract)**

18   20.     Plainfield and Cuneo Capital refer to, reallege, and incorporate by

19   reference paragraphs 1 through 19 of this Complaint as if fully set forth herein.

20   21.     The Agreement, which includes the Note and incorporates the Note by

21   reference, is a valid and binding contract between Plainfield and Cuneo Capital, on the one hand,

22   and Penta Water, on the other.

23   22.     Plainfield and Cuneo Capital have performed all of their obligations under

24   the Agreement, except to the extent that their performance has been waived or excused by Penta

25   Water's breach of, and defaults under, the Agreement.

26   23.     Penta Water has breached, and continues to breach, the Agreement by,

27   among other things, (a) failing to repay the loaned amount of $3,000,000 and the interest that has

28   accrued and continues to accrue pursuant to the Agreement; (b) failing to furnish an annual

5585305.1                                      - 5 -

COMPLAINT

1   budget for the 2008 calendar year by December 1, 2007; (c) failing to avoid a Material Adverse

2   Change; and (d) failing to maintain an adjusted consolidated EBITDA, calculated for the

3   immediately preceding 12 months, of at least $1,000,000 as of the fiscal quarter ending March 31,

4   2008.

5        24.    Each of these breaches independently constitutes an Event of Default under

6   the Agreement.  There has been an ongoing Event of Default since no later than December 1,

7   2007.  Since no later than that date, Plainfield and Cuneo Capital have been entitled to repayment

8   of the outstanding principal, plus the interest accruing under Section 7.6 and the interest accruing

9   at the Default Rate under Section 7.8 of the Agreement.

10       25.    Plainfield and Cuneo Capital are informed and believe, and based on such

11  information and belief allege, that other Events of Default may have occurred and are continuing.

12       26.    On May 28, 2008, Plainfield declared the Note to be immediately due and

13  payable pursuant to Section 13 of the Agreement.  Demand was made on Penta Water for

14  payment in full of all outstanding principal and all interest accrued to the date of payment, but

15  Penta Water has failed and refused, and continues to fail and refuse, to do so.

16       27.    As a direct and proximate result of Penta Water's breach of the Agreement,

17  Plainfield has been damaged in the amount of the unpaid principal of $2,700,000, together with

18  the interest that has accrued and continues to accrue under Sections 7.6 and 7.8 of the Agreement.

19       28.    As a direct and proximate result of Penta Water's breach of the Agreement,

20  Cuneo Capital has been damaged in the amount of the unpaid principal of $300,000, together with

21  the interest that has accrued and continues to accrue under Sections 7.6 and 7.8 of the Agreement

22       29.    Plainfield and Cuneo Capital are further entitled to be paid their respective

23  reasonable attorneys' fees, expenses and costs of suit incurred herein, pursuant to Section 17 of

24  the Agreement.

25                         **SECOND CAUSE OF ACTION**

26                            **(Open Book Account)**

27       30.    Plainfield and Cuneo Capital refer to and incorporate by reference

28  paragraphs 1 through 29 of this Complaint as if fully set forth herein.

5585305.1                              - 6 -

1    31.    Prior to the commencement of this action, Penta Water became indebted on

2  an open book account to Plainfield and to Cuneo Capital in the sums of $2,700,000 and $300,000,

3  respectively, plus interest that has accrued since July 5, 2007 and continues to accrue pursuant to

4  the Agreement.  Plainfield and Cuneo Capital furnished these sums to Penta Water at Penta

5  Water's special instance and request.

6    32.    Penta Water has not paid these sums, and these sums are still due and

7  owing to Plainfield and Cuneo Capital since May 28, 2008, the date demand for payment was

8  duly made on Penta Water.

9    33.    As a result of Penta Water's failure of payment on an open book account,

10  there is currently due, owing, and unpaid to Plainfield money in an amount of $2,700,000 plus

11  interest accruing under Sections 7.6 and 7.8 of the Agreement.

12    34.    As a result of Penta Water's failure of payment on an open book account,

13  there is currently due, owing, and unpaid to Cuneo Capital money in an amount of $300,000 plus

14  interest accruing under Sections 7.6 and 7.8 of the Agreement.

15  ## THIRD CAUSE OF ACTION

16  ### (Account Stated)

17    35.    Plainfield and Cuneo Capital refer to and incorporate by reference

18  paragraphs 1 through 34 of this Complaint as if fully set forth herein.

19    36.    On or about May 28, 2008, an account was stated in writing by and

20  between Plainfield and Penta Water wherein and whereby the sum of $2,700,000 plus interest that

21  has accrued since July 5, 2007 and continues to accrue pursuant to the Agreement was found to

22  be due to Plainfield.  On or about May 28, 2008, an account was stated in writing by and between

23  Cuneo Capital and Penta Water wherein and whereby the sum of $300,000 plus interest that has

24  accrued since July 5, 2007 and continues to accrue pursuant to the Agreement was found to be

25  due to Plainfield.

26    37.    Penta Water has not paid these sums, and these sums are still due and

27  owing to Plainfield and Cuneo Capital since May 28, 2008, the date demand for payment was

28  duly made on Penta Water.

5585305.1                                          - 7 -

1    38.    As a result of Penta Water's failure of payment on an account stated, there

2  is currently due, owing, and unpaid to Plainfield money in an amount of $2,700,000 plus interest

3  accruing under Sections 7.6 and 7.8 of the Agreement.

4    39.    As a result of Penta Water's failure of payment on an account stated, there

5  is currently due, owing, and unpaid to Cuneo Capital money in an amount of $300,000 plus

6  interest accruing under Sections 7.6 and 7.8 of the Agreement.

7    **FOURTH CAUSE OF ACTION**

8    **(Money Lent or Paid)**

9    40.    Plainfield and Cuneo Capital refer to and incorporate by reference

10  paragraphs 1 through 39 of this Complaint as if fully set forth herein.

11    41.    On or about May 28, 2008, Penta Water became indebted to Plainfield and

12  to Cuneo Capital for money lent to Penta Water at Penta Water's request, in the sums of

13  $2,700,000 and $300,000, respectively, plus interest that has accrued since July 5, 2007 and

14  continues to accrue pursuant to the Agreement.

15    42.    Penta Water has not paid these sums, and these sums are still due and

16  owing to Plainfield and Cuneo Capital since May 28, 2008, the date demand for payment was

17  duly made on Penta Water.

18    43.    As a result of Penta Water's failure of payment on money lent or paid,

19  there is currently due, owing, and unpaid to Plainfield money in an amount of $2,700,000 plus

20  interest accruing under Sections 7.6 and 7.8 of the Agreement.

21    44.    As a result of Penta Water's failure of payment on money lent or paid,

22  there is currently due, owing, and unpaid to Cuneo Capital money in an amount of $300,000 plus

23  interest accruing under Sections 7.6 and 7.8 of the Agreement..

24    **PRAYER FOR RELIEF**

25    WHEREFORE, Plainfield and Cuneo Capital pray for relief as follows:

26    1.    On the First Cause of Action, for damages in an amount to be proven at

27  trial, in an amount in excess of $2,700,000 and $300,000, respectively to Plainfield and Cuneo

28  Capital, plus interest that has accrued and is accruing pursuant to Sections 7.6 and 7.8 of the

COMPLAINT

1  Agreement;

2           2.      On the Second, Third, and Fourth Causes of Action, for the sum of

3  $2,700,000 and $300,000, respectively to Plainfield and Cuneo Capital, plus interest that has

4  accrued and is accruing pursuant to Sections 7.6 and 7.8 of the Agreement;

5           2.      On all Causes of Action, for pre-judgment interest to the fullest extent

6  permitted by law;

7           3.      On all Causes of Action, for Plainfield's and Cuneo Capital's respective

8  attorneys' fees and other costs of suit; and

9           4.      On all Causes of Action, for such other and further relief as the Court

10  deems just and proper.

11  DATED: July 25, 2008                    MUNGER, TOLLES & OLSON LLP

12

13                                          By: _____
                                                 *Katherine Huang*
14                                               KATHERINE K. HUANG

15                                          Attorneys for Plaintiffs
                                            PLAINFIELD DIRECT INC. and
16                                          CUNEO CAPITAL PARTNERS I LLC

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit A**

# EXHIBIT "A"

PENTA WATER COMPANY, INC.
(formerly known as
Bio-Hydration Research Lab, Inc.)

10% Senior Unsecured Notes

NOTE PURCHASE AGREEMENT

Dated as of June 28, 2007

Houston 3262609v.6

# TABLE OF CONTENTS

Section                                                                                          Page

1.    DEFINITIONS AND CONSTRUCTION ................................................................... 1

2.    AUTHORIZATION OF NOTES ............................................................................. 2

3.    ISSUANCE OF NOTES ...................................................................................... 2

4.    CLOSING ....................................................................................................... 3

5.    CONDITIONS TO CLOSING ............................................................................... 3

5.1.    Certificates as to Resolutions, etc. ............................................................... 3
5.2.    Good Standing Certificates, etc. ................................................................... 3
5.3.    Agreement ............................................................................................... 3
5.4.    Notes ..................................................................................................... 3
5.5.    Opinions of Counsel ................................................................................. 4
5.6.    Budget .................................................................................................... 4
5.7.    Lien Search Certificates ............................................................................ 4
5.8.    Service of Process .................................................................................... 4
5.9.    Compliance Certificate .............................................................................. 4
5.10.    Receipt Permitted by Applicable Law, etc. ................................................... 4
5.11.    Fees, etc. ............................................................................................... 5
5.12.    Due Diligence ......................................................................................... 5
5.13.    Final Credit Approval ............................................................................... 5
5.14.    Consents and Approvals ............................................................................ 5
5.15.    Environmental Condition ........................................................................... 5
5.16.    Proceedings and Documents ...................................................................... 5

6.    CONDITIONS TO ADVANCES ............................................................................ 5

6.1.    Fees, etc. ............................................................................................... 5
6.2.    Advance Request ...................................................................................... 6
6.3.    Funding Permitted by Applicable Law, etc. ................................................... 6
6.4.    Default .................................................................................................... 6
6.5.    Material Adverse Effect ............................................................................. 6
6.6.    Representations and Warranties ................................................................... 6
6.7.    Conditions to Subsequent Advances ............................................................. 7
6.8.    Deemed Representation and Warranty .......................................................... 7

7.    PAYMENT AND PREPAYMENT OF THE NOTES; TRANSACTION FEES;
INTEREST; DEFAULT INTEREST, ETC. ...................................................................... 7

7.1.    Principal Payments and Final Maturity Date .................................................. 7
7.2.    Optional Prepayments Without Penalty ......................................................... 7
7.3.    Mandatory Prepayments ............................................................................ 7
7.4.    Allocation of Partial Prepayments ............................................................... 8
7.5.    Maturity; Surrender, etc. ........................................................................... 8
7.6.    Interest ................................................................................................... 8

i

| 7.7. | Transaction Fees | 8 |
| 7.8. | Default Interest | 9 |
| 8. | REPRESENTATIONS AND WARRANTIES OF THE OBLIGORS | 9 |
| 8.1. | Organization; Powers | 9 |
| 8.2. | Authority; Enforceability | 9 |
| 8.3. | Approvals; No Conflicts | 10 |
| 8.4. | Financial Condition; No Material Adverse Effect | 10 |
| 8.5. | Litigation | 10 |
| 8.6. | Environmental Matters | 11 |
| 8.7. | Compliance with Laws and Agreements; No Defaults | 12 |
| 8.8. | Investment Company Act | 12 |
| 8.9. | Taxes | 12 |
| 8.10. | ERISA | 12 |
| 8.11. | Disclosure; No Material Misstatements | 13 |
| 8.12. | Insurance | 14 |
| 8.13. | Equity Interests, etc. | 14 |
| 8.14. | Location of Business and Offices | 14 |
| 8.15. | Properties; Title, etc. | 15 |
| 8.16. | Maintenance of Properties | 15 |
| 8.17. | Swap Agreements | 15 |
| 8.18. | Use of Proceeds of Notes | 16 |
| 8.19. | Solvency | 16 |
| 8.20. | Labor Matters | 16 |
| 8.21. | Material Contracts | 16 |
| 8.22. | Private Offering by the Company | 17 |
| 8.23. | Foreign Asset Control Regulations, etc. | 17 |
| 9. | REPRESENTATIONS OF THE PURCHASER | 17 |
| 9.1. | Purchase for Investment | 17 |
| 9.2. | Source of Funds | 17 |
| 10. | AFFIRMATIVE COVENANTS | 19 |
| 10.1. | Financial Statements; Ratings Change; Other Information | 19 |
| 10.2. | Notice of Material Events | 21 |
| 10.3. | Existence; Conduct of Business | 22 |
| 10.4. | Material Contracts | 22 |
| 10.5. | Payment of Obligations | 22 |
| 10.6. | Performance of Obligations under Note Documents | 22 |
| 10.7. | Operation and Maintenance of Properties | 22 |
| 10.8. | Insurance | 23 |
| 10.9. | Books and Records; Inspection Rights | 23 |
| 10.10. | Compliance with Laws | 23 |
| 10.11. | Guarantors | 23 |
| 10.12. | Board Observation Rights | 23 |
| 10.13. | Post Closing Requirements | 23 |
| 10.14. | ERISA Compliance | 24 |

ii

10.15. Further Assurances....................................................................................24

11.    NEGATIVE COVENANTS .........................................................................24

11.1.  Debt..........................................................................................................24
11.2.  Liens.........................................................................................................25
11.3.  Restricted Payments, etc. ........................................................................26
11.4.  Investments, Loans and Advances...........................................................26
11.5.  Nature of Business ...................................................................................27
11.6.  Prepayments.............................................................................................27
11.7.  Limitation on Leases................................................................................27
11.8.  Proceeds of Notes ....................................................................................28
11.9.  ERISA Compliance ..................................................................................28
11.10. Sale of Discount of Receivables .............................................................29
11.11. Mergers, etc..............................................................................................29
11.12. Sale of Properties .....................................................................................30
11.13. Environmental Matters.............................................................................30
11.14. Subsidiaries..............................................................................................30
11.15. Terrorism Sanctions Regulations.............................................................30
11.16. Dividend Restrictions...............................................................................30
11.17. Swap Agreements .....................................................................................30
11.18. Sale and Leaseback ..................................................................................30
11.19. Transactions with Affiliates.....................................................................30
11.20. Amendment, etc. of Material Contracts....................................................30
11.21. Amendment of Organizational Documents ..............................................31
11.22. Financial Covenants..................................................................................31

12.    EVENTS OF DEFAULT .............................................................................32

13.    REMEDIES ON DEFAULT, ETC. ..............................................................34

13.1.  Acceleration .............................................................................................34
13.2.  Other Remedies........................................................................................35
13.3.  Rescission ................................................................................................35
13.4.  No Waivers or Election of Remedies, Expenses, etc...............................36

14.    GUARANTIES; SUBORDINATION OF OBLIGOR CLAIMS. ...................36

14.1.  Guaranties ................................................................................................36
14.2.  Right of Contribution...............................................................................37
14.3.  No Subrogation ........................................................................................37
14.4.  Amendments, etc. with respect to the Guarantied Obligations................37
14.5.  Waivers ....................................................................................................38
14.6.  Guaranty Absolute and Unconditional.....................................................38
14.7.  Reinstatement...........................................................................................40
14.8.  Payments ..................................................................................................40
14.9.  Representations and Warranties................................................................40
14.10. Affirmative and Negative Covenants.......................................................40
14.11. Subordination of Obligor Claims.............................................................40

15.    REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES...................41

iii

15.1.    Registration of Notes .................................................................................. 41
15.2.    Transfer and Exchange of Notes.................................................................. 42
15.3.    Replacement of Notes .................................................................................. 42

16.    PAYMENTS ON NOTES............................................................................. 42

16.1.    Place of Payment.......................................................................................... 42

17.    EXPENSES, TAXES, ETC........................................................................... 43

17.1.    Expenses; Indemnity; Damage Waiver......................................................... 43
17.2.    Taxes ............................................................................................................ 45
17.3.    Survival ........................................................................................................ 46

18.    SURVIVAL; REVIVAL; REINSTATEMENT; ENTIRE AGREEMENT...................... 46

19.    AMENDMENT AND WAIVER .................................................................... 47

19.1.    Requirements ............................................................................................... 47
19.2.    Solicitation of Holders of Notes .................................................................. 47
19.3.    Binding Effect, etc. ...................................................................................... 48
19.4.    Notes held by Company, etc. ....................................................................... 48

20.    REPRODUCTION OF DOCUMENTS ........................................................ 48

21.    CONFIDENTIAL INFORMATION ............................................................. 48

22.    NOTICES ...................................................................................................... 49

23.    SUBSTITUTION OF PURCHASER............................................................ 50

24.    ADMINISTRATIVE AGENT ....................................................................... 50

24.1.    Appointment; Powers................................................................................... 50
24.2.    Duties and Obligations of Administrative Agent.......................................... 50
24.3.    Action by Administrative Agent................................................................... 51
24.4.    Reliance by Administrative Agent................................................................. 51
24.5.    Subagents ..................................................................................................... 52
24.6.    Resignation or Removal of Administrative Agent......................................... 52
24.7.    Administrative Agent as a Holder................................................................. 52
24.8.    No Reliance.................................................................................................. 53

25.    MISCELLANEOUS...................................................................................... 53

25.1.    Successors and Assigns................................................................................ 53
25.2.    Payments Due on Non-Business Days.......................................................... 53
25.3.    Severability .................................................................................................. 54
25.4.    Construction................................................................................................. 54
25.5.    Counterparts................................................................................................. 54
25.6.    USA Patriot Act Notice .............................................................................. 54
25.7.    Interest Rate Limitation ............................................................................... 54
25.8.    GOVERNING LAW; JURISDICTION; SERVICE OF PROCESS ............................ 55

SCHEDULE A        --        INFORMATION RELATING TO PURCHASERS

iv

SCHEDULE B           --           DEFINED TERMS


SCHEDULE 8.4         --           Financial Condition, Etc.

SCHEDULE 8.5         --           Litigation

SCHEDULE 8.6         --           Environmental Matters

SCHEDULE 8.9         --           Taxes

SCHEDULE 8.13        --           Equity Interests

SCHEDULE 8.15        --           Title, Etc.

SCHEDULE 8.21        --           Material Contracts

SCHEDULE 11.1        --           Existing Debt

SCHEDULE 11.2        --           Existing Liens

SCHEDULE 11.19       --           Transactions with Affiliates


EXHIBIT 1       --       Form of 10% Senior Unsecured Note

EXHIBIT 5.5     --       List of Opinions of Counsel

EXHIBIT 5.9--            Form of Compliance Certificate

EXHIBIT 6.2  --          Form of Advance Request

v

**PENTA WATER COMPANY, INC.**
(formerly known as
**Bio-Hydration Research Lab, Inc.)**
**2091 Rutherford Road**
**Carlsbad, California 92008**

**10% Senior Unsecured Notes**

June 28, 2007

TO EACH OF THE PURCHASERS LISTED IN
THE ATTACHED SCHEDULE A:

Ladies and Gentlemen:

Penta Water Company, Inc. (formerly known as Bio-Hydration Research Lab, Inc.), a corporation organized and existing under the laws of the State of California (the *"Company"*), hereby agrees with each of the purchasers whose names appear at the end hereof (each, a *"Purchaser"* and, collectively, the *"Purchasers"*) and with Plainfield Direct West II LLC, a limited liability company organized and existing under the laws of the State of Delaware, as administrative agent for the benefit of the Purchasers (acting in such capacity, together with it successors and assigns in such capacity, herein referred to as the *"Administrative Agent"*) as follows:

1.    **DEFINITIONS AND CONSTRUCTION.**

(a)    Definitions. Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule B.

(b)    Accounting Terms and Determinations; GAAP. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Purchasers hereunder shall be prepared, in accordance with GAAP, applied on a basis consistent with the first financial statements that are furnished by the Obligors pursuant to the provisions of Section 10.1(a), except for changes in which Company's independent certified public accountants concur and which are disclosed to the Purchasers on the next date on which financial statements are required to be delivered to the Purchasers pursuant to Section 10.1(a); provided that, unless the Company and the Administrative Agent shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods.

(c)    Terms Generally; Rules of Construction. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase

1

"without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Note Documents), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Note Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Annexes, Exhibits and Schedules to, this Agreement. No provision of this Agreement or any other Note Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

## 2.     AUTHORIZATION OF NOTES.

The Company will authorize the issuance of $6,000,000.00 aggregate principal amount of its 10% Senior Unsecured Notes due June 28, 2012 (the "**Notes**", such term to include any such notes issued in substitution therefor pursuant to Section 15). The Notes shall be substantially in the form set out in Exhibit 1. The Notes shall be funded in up to four (4) advances (each, an "**Advance**") during the Availability Period. The first such Advance shall be a made by each Purchaser on the Closing Date and shall be in the amount of $3,000,000. The Company may, at its discretion (but subject to the terms and conditions hereof, including, without limitation the conditions set forth in Section 6 hereof), during the Availability Period, request that one or more of three (3) subsequent Advances (each herein referred to as a "**Subsequent Advance**") be made and, if made, each such Subsequent Advance shall be in the amount of $1,000,000 or such lesser amount (but in no event less than $250,000) as the Company may then request. The total of all Subsequent Advances shall in no event exceed, in the aggregate, $3,000,000. Once an Advance has been funded, the Company may not under any circumstances reborrow the amount of such Advance.

## 3.     ISSUANCE OF NOTES.

Subject to the terms and conditions of this Agreement, (a) the Company will issue to each Purchaser, at the Closing, Notes in the principal amount specified opposite such Purchaser's name in Schedule A, and (b) each Purchaser agrees to make Advances to the Company during the Availability Period in an aggregate principal amount that will not result in (i) the principal amount of the Advances funded by any one Purchaser exceeding such Purchaser's Commitment or (ii) the aggregate amount of the Advances funded by all Purchasers exceeding the total Commitments of all Purchasers. The Purchasers' obligations hereunder are several and not joint obligations, and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

2

## 4.  CLOSING.

The issuance of the Notes to each Purchaser shall occur at a closing (the *"Closing"*) to be held at such time (the *"Closing Date"*) and place as may be agreed upon by the Company and the Purchasers. At the Closing, the Company will deliver to each Purchaser the Notes to be issued to such Purchaser in the form of a single Note (or such greater number of Notes up to a maximum of twenty (20) Notes in denominations of at least $250,000 as such Purchaser may request) dated as of the Closing Date and registered in such Purchaser's name (or in the name of its nominee). If at the Closing the Company shall fail to tender such Notes to any Purchaser as provided above in this Section 4, or any of the conditions specified in Section 5 shall not have been fulfilled to such Purchaser's satisfaction, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement, without thereby waiving any rights such Purchaser may have by reason of such failure or such nonfulfillment.

## 5.  CONDITIONS TO CLOSING.

The obligations of each Purchaser to fund Advances hereunder shall not become effective, and the "Closing Date" shall not be deemed to have occurred, until the date on which each of the following conditions is satisfied (or waived in accordance with Section 19.1 hereof):

### 5.1.  Certificates as to Resolutions, etc.

The Administrative Agent shall have received a certificate of the Secretary of the Board of Directors of the Company setting forth (a) resolutions of its Board of Directors with respect to the authorization of the Company to execute and deliver the Note Documents to which it is a party and to enter into the transactions contemplated in those documents, (b) the officers of the Company (i) who are authorized to sign the Note Documents to which the Company is a party and (ii) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (c) specimen signatures of such authorized officers, and (d) the constitutive documents of the Company certified as being true and complete. Each Purchaser may conclusively rely on such certificate until such Purchaser receives notice in writing from the Company to the contrary.

### 5.2.  Good Standing Certificates, etc..

Each Purchaser shall have received certificates copies of the appropriate governmental agencies with respect to the existence, qualification and good standing of the Company.

### 5.3.  Agreement.

Each Purchaser shall have received from each party hereto counterparts (in such number as may be requested by such Purchaser) of this Agreement signed on behalf of such party.

### 5.4.  Notes.

3

Each Purchaser shall have received duly the Notes that are to be issued to such Purchaser at the Closing, which Notes shall payable to the order of such Purchaser, which Notes will be transferable to the extent permitted under 25.1 hereof.

### 5.5. Opinions of Counsel.

The Administrative Agent shall have received the opinions of counsel listed on Exhibit 5.5, which opinions of counsel shall be in from and substance satisfactory to the Administrative Agent.

### 5.6. Budget.

The Administrative Agent shall have received the Budget of the Company for the calendar year 2007.

### 5.7. Lien Search Certificates.

Each Purchaser shall have ordered and received appropriate lien search certificates with respect to the Properties of the Company, which lien search certificates shall be in form and substance satisfactory to such Purchaser in its sole and absolute discretion.

### 5.8. Service of Process.

The Administrative Agent shall have received a letter from Dennis O'Brien, President evidencing the appointment of Corporation Service Company as authorized agent for service of process on the Company under each Note Document to which it is a party.

### 5.9. Compliance Certificate.

The Administrative Agent shall have received a compliance certificate which shall be substantially in the form of Exhibit 5.9, duly and properly executed by a Responsible Officer and dated as of the Closing Date.

### 5.10. Receipt Permitted by Applicable Law, etc..

On the Closing Date (a) each Purchaser's receipt of the Notes to be issued to such Purchaser at the Closing shall (i) be permitted by the laws and regulations of each jurisdiction to which such Purchaser is subject, without recourse to provisions (such as section 1405(a)(8) of the New York Insurance Law) permitting limited investments by insurance companies without restriction as to the character of the particular investment, (ii) not violate any applicable law or regulation (including, without limitation, Regulation T, U or X of the Board of Governors of the Federal Reserve System) and (iii) not subject such Purchaser to any tax, penalty or liability under or pursuant to any applicable law or regulation, which law or regulation was not in effect on the date hereof, and (b) no litigation shall be pending or threatened against the Company, which does or, with respect to any threatened litigation, seeks to, enjoin, prohibit or restrain, the purchase or repayment of any Notes or the consummation of the transactions contemplated by this Agreement or any other Note Document. If requested by such Purchaser, such Purchaser shall have received a certificate of a Responsible Officer certifying as to such matters of fact as such

4

Purchaser may reasonably specify to enable such Purchaser to determine whether such Purchaser's receipt of such Notes is so permitted.

**5.11. Fees, etc.**

Each Purchaser shall have received all fees (including the relevant Transaction Fees) and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Company hereunder to such Purchaser.

**5.12. Due Diligence.**

Each Purchaser shall have satisfactorily completed its due diligence, in form and scope satisfactory to such Purchaser in its sole and absolute discretion, on each Obligor and on the Notes to be issued by the Company at the Closing to such Purchaser (including, without limitation, due diligence related to the Company's assets, patents, management, legal considerations, investment banking advisory agreements and other matters).

**5.13. Final Credit Approval.**

Each Purchaser shall have received final credit and investment approvals.

**5.14. Consents and Approvals.**

Each Purchaser shall have received all consents and approvals required by Section 8.3 to be obtained on or prior to the Closing Date, if any.

**5.15. Environmental Condition.**

Each Purchaser shall be satisfied with the environmental condition of the Properties of the Obligors and the Subsidiaries.

**5.16. Proceedings and Documents.**

All corporate and other proceedings in connection with the transactions contemplated by this Agreement and the other Note Documents and all documents and instruments incident to all such transactions shall be satisfactory to each Purchaser and such Purchaser's special counsel, and each Purchaser and such Purchaser's special counsel shall have received all such counterpart originals or certified or other copies of such documents as such Purchaser or such Purchaser's special counsel may request.

**6. CONDITIONS TO ADVANCES.**

The Obligation of each Purchaser to make each Advance is subject to the satisfaction of the following conditions:

**6.1. Fees, etc.**

5

In the case of each Advance, each Purchaser shall have received all fees (including the relevant Transaction Fees) and other amounts due and payable to such Purchaser on or prior to the funding date for each Advance, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Company to such Purchaser hereunder.

### 6.2.    Advance Request.

At least one (1) Business Day prior to the funding date for the first Advance and at least three (3) Business Days prior to the funding date for each Subsequent Advance (or such shorter time periods to which any Purchaser may agree), each Purchaser shall have received an advance request substantially in the form attached hereto as Exhibit 6.2, duly completed and signed by a Responsible Officer of the Company.

### 6.3.    Funding Permitted by Applicable Law, etc.

On the funding date for each Advance (a) each Purchaser's funding of such Advance shall (i) be permitted by the laws and regulations of each jurisdiction to which such Purchaser is subject, without recourse to provisions (such as section 1405(a)(8) of the New York Insurance Law) permitting limited investments by insurance companies without restriction as to the character of the particular investment, (ii) not violate any applicable law or regulation (including, without limitation, Regulation T, U or X of the Board of Governors of the Federal Reserve System) and (iii) not subject such Purchaser to any tax, penalty or liability under or pursuant to any applicable law or regulation, which law or regulation was not in effect on the date hereof, and (b) no litigation shall be pending or threatened, which does or, with respect to any threatened litigation, seeks to, enjoin, prohibit or restrain, the funding or repayment of any Notes or the consummation of the transactions contemplated by this Agreement or any other Note Document. If requested by such Purchaser, such Purchaser shall have received a certificate of a Responsible Officer certifying as to such matters of fact as such Purchaser may reasonably specify to enable such Purchaser to determine whether such funding is so permitted.

### 6.4.    Default.

At the time of and immediately after giving effect to the funding of each Advance, no Default shall have occurred and be continuing.

### 6.5.    Material Adverse Effect.

Since December 31, 2006 through the time of and immediately after giving effect to the funding of each Advance, there has been no event, development of circumstance that has occurred or that then exists that has resulted in, or could reasonably be expected to have, a Material Adverse Effect.

### 6.6.    Representations and Warranties.

The representations and warranties of the Company and the other Obligors set forth in this Agreement and in the other Note Documents shall be true and correct on and as of the funding date for each Advance, except to the extent any such representations and warranties are

6

expressly limited to an earlier date, in which case, on and as of such funding date, such representations and warranties shall continue to be true and correct as of such specified earlier date.

### 6.7. Conditions to Subsequent Advances.

Prior to the making of each Subsequent Advance under this Agreement, each of the following additional conditions precedent shall have been satisfied:

(a)  The Company shall be in compliance, on a pro forma basis, with the financial covenants set forth in Section 11.22.

(b)  After giving effect to such Subsequent Advance, the Leverage Ratio, determined on a pro forma basis, shall be less than or equal to 4.50 to 1.00.

### 6.8. Deemed Representation and Warranty.

Each request for an Advance shall be deemed to constitute a representation and warranty by the Company on the date thereof as to the matters specified in Sections 6.4 through 6.7 hereof.

## 7. PAYMENT AND PREPAYMENT OF THE NOTES; TRANSACTION FEES; INTEREST; DEFAULT INTEREST, ETC.

### 7.1. Principal Payments and Final Maturity Date.

The principal amount of the Notes then shall be due and payable in full on the Final Maturity Date.

### 7.2. Optional Prepayments Without Penalty.

The Company may, at its option and without any penalty or premium, upon notice as provided below, prepay at any time all, or from time to time any part of, the Notes, in an amount not less than 5% of the aggregate principal amount of the Notes then outstanding in the case of a partial prepayment, at 100% of the principal amount so prepaid, together with any unpaid accrued interest on the amount so prepaid. The Company will give each Holder of Notes written notice of each optional prepayment under this Section 7.2 not less than five (5) calendar days prior to the date fixed for such prepayment. Each such notice shall specify such date (which shall be a Business Day), the aggregate principal amount of the Notes to be prepaid on such date, the principal amount of each Note held by such holder to be prepaid (determined in accordance with Section 7.4), and the interest to be paid on the prepayment date with respect to such principal amount being prepaid.

### 7.3. Mandatory Prepayments.

If a Change of Control occurs, then, at the option of the Required Holders, the full outstanding principal balance (at 100% of such principal amount) of the Notes, together with all accrued unpaid interest thereon (but without any penalty or premium), and all other amounts

7

owed by any Obligor under any Note Document, shall be due and payable in full (a) in the case of a sale by the Existing Shareholders (as such term is defined in the definition of "Change of Control" in Schedule B attached hereto) of their Equity Interests in the Company, on the fifth Business Day after the delivery by the Administrative Agent to the Company of a written notice requiring such prepayment and (b) in all other cases, within ninety (90) calendar days after the delivery by the Administrative Agent to the Company of a written notice requiring such prepayment. If a Change of Control occurs, the Company shall give immediate written notice thereof to the Administrative Agent and each Holder.

**7.4.    Allocation of Partial Prepayments.**

In the case of each partial prepayment of the Notes, the principal amount of the Notes to be prepaid shall be allocated among all of the Notes at the time outstanding in proportion, as nearly as practicable, to the respective unpaid principal amounts thereof not theretofore called for prepayment.

**7.5.    Maturity; Surrender, etc.**

In the case of each prepayment of Notes pursuant to this Section 7, the principal amount of each Note to be prepaid shall mature and become due and payable on the date fixed for such prepayment, together with interest (if any) on such principal amount accrued to such date. From and after such date, unless the Company shall fail to pay such principal amount when so due and payable, together with the interest as aforesaid, interest (if any) on such principal amount shall cease to accrue.

**7.6.    Interest.**

(a)    The outstanding principal amount of the Notes shall bear interest until maturity at a fixed interest rate of 10% per annum, but in no event to exceed the Highest Lawful Rate. Accrued unpaid interest with respect to the Notes shall be due and payable in arrears on each Payment Date and on the Final Maturity Date. If the Company, at its discretion, elects not make any interest payment on the Notes in cash, then such interest payment shall be payable in kind (herein referred to as "*PIK Interest*") and shall be automatically (without further action) added to the outstanding principal balance of each Note and any such amounts so added shall thereafter, for all purposes, be deemed to be a part of the principal amount of such Note. For the avoidance of doubt, (i) with respect to any accrued unpaid interest on any Note that is added to such Note as PIK Interest in accordance with the preceding sentence, the Company shall not be deemed to have defaulted in the payment of such accrued unpaid interest, and (ii) all the Notes shall be subject to such PIK Interest option of the Company, and the Company may so opt with respect to all (but not less than all) of the Notes then outstanding.

(b)    All interest under this Section 7.6 and Section 7.8 (and the Commitment Fees provided for in Section 7.7(b)) shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

**7.7.    Transaction Fees.**

8

(a)     On the Closing Date, the Company shall pay to the Administrative Agent (for the ratable benefit of each Purchaser) a closing fee of $180,000.

(b)     The Company agrees to pay to each Purchaser a commitment fee (the *"Commitment Fee"*), which shall accrue at the rate of 1% on the average daily amount of the unused amount of the Subsequent Advances committed to be funded by such Purchaser pursuant to such Purchaser's Commitment, during the period from and including the date of this Agreement to but excluding the date that is the earlier of (i) the date on which the last Subsequent Advance is funded, or (ii) the Final Maturity Date. Accrued Commitment Fees shall be payable in arrears on each Payment Date and on the Final Maturity Date. If the Company, at its discretion, elects not to pay the Commitment Fee in cash, then such Commitment Fees shall be payable in kind (herein referred to as *"PIK Fees"*) and shall be automatically (without further action) added to the outstanding principal balance of the relevant Purchaser's Note and any such amounts so added shall thereafter, for all purposes, be deemed to be a part of the principal amount of such Note. For the avoidance of doubt, (x) with respect to Commitment Fees that are added to any such Note as PIK Fees in accordance with the preceding sentence, the Company shall not be deemed to have defaulted in the payment of such Commitment Fees, and (y) on any given Payment Date, the Company may so opt only with respect to all (but not less than all) of the Commitment Fees due on such Payment Date.

**7.8.     Default Interest.**  If an Event of Default has occurred and is continuing, or if any principal of or interest on any Note or any fee or other amount payable by the Company or any other Obligor hereunder or under any other Note Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, then the principal amount of the Notes then outstanding, in the case of an Event of Default, and such overdue amount, in the case of a failure to pay amounts when due, shall bear interest, after as well as before judgment, at a fixed interest rate of 13% per annum, but in no event to exceed the Highest Lawful Rate (the *"Default Rate"*).

**8.     REPRESENTATIONS AND WARRANTIES OF THE OBLIGORS.**  Each Obligor represents and warrants to the Administrative Agent and each Purchaser that:

**8.1.     Organization; Powers.**  Each of the Obligors is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

**8.2.     Authority; Enforceability.**  The Transactions are within the Obligors' company or corporate powers (as the case may be) and have been duly authorized by all necessary company or corporate (as the case may be) and, if required, stockholder action (including, without limitation, any action required to be taken by any class of directors of the Obligors or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions). Each Note Document to which any Obligor is a party has been duly executed and delivered by such Obligor and constitutes a legal, valid and binding obligation of such Obligor, as applicable, enforceable in accordance with its terms, subject to applicable

9

bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**8.3.    Approvals; No Conflicts.**  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person (including partners, whether interested or disinterested, of any Obligor or any other Person), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Note Document or the consummation of the transactions contemplated thereby, except (i) such as have been obtained or made and are in full force and effect or, in the reasonable judgment of the relevant Obligor, can reasonably be expected to be obtained when needed, and (ii) those third party approvals or consents which, if not made or obtained, would not cause a Default hereunder, could not reasonably be expected to have a Material Adverse Effect or do not have an adverse effect on the enforceability of the Note Documents, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of any Obligor or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Obligor or its Properties, or give rise to a right thereunder to require any payment to be made by any such Obligor and (d) will not result in the creation or imposition of any Lien on any Property of any Obligor (other than the Liens created by the Note Documents).

**8.4.    Financial Condition; No Material Adverse Effect.**

(a)    Except as disclosed on the attached Schedule 8.4 (which shall apply for the purposes of this entire Section 8.4), the Company has heretofore furnished to the Administrative Agent and each Purchaser its balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2006, reported on by J. H. Cohn & Company, independent public accountants, and (ii) as of and for the fiscal quarter and the portion of the fiscal year ended March 31, 2007, certified by its chief financial officer.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Company and its Consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and GAAP adjustments the absence of footnotes in the case of the unaudited quarterly financial statements.

(b)    Since December 31, 2006, (i) there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect and (ii) the business of each Obligor has been conducted only in the ordinary course consistent with past business practices.

(c)    None of the Obligors has on the date hereof any material Debt (including Disqualified Capital Stock) or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as disclosed on the financial statements referred to in Section 8.4(a) or otherwise disclosed on a Schedule attached hereto.

**8.5.    Litigation.**

10

Except as disclosed on the attached Schedule 8.5 (which shall apply for the purposes of this entire Section 8.5), there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the Knowledge of each Obligor, threatened against or affecting such Obligor (i) as to which there is a reasonable possibility of an adverse determination that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (ii) that involve any Note Document or the Transactions.

**8.6.    Environmental Matters.**  Except as could not be reasonably expected to have a Material Adverse Effect (or with respect to (c), (d) and (e) below, where the failure to take such actions could not be reasonably expected to have a Material Adverse Effect):

(a)    neither any Property of any Obligor nor the operations conducted thereon violate any order or requirement of any court or Governmental Authority or any Environmental Laws.

(b)    except as set forth on Schedule 8.6, no Property of any Obligor nor the operations currently conducted thereon or, to the Knowledge of such Obligor, by any prior owner or operator of such Property or operation, are in violation of or subject to any existing, pending or threatened action, suit, investigation, inquiry or proceeding by or before any court or Governmental Authority or to any remedial obligations under Environmental Laws.

(c)    all notices, permits, licenses, exemptions, approvals or similar authorizations, if any, required to be obtained or filed in connection with the operation or use of any and all Property of each Obligor, including, without limitation, past or present treatment, storage, Disposal or Release of a Hazardous Substance, Oil and Gas Waste or Solid Waste into the environment, have been duly obtained or filed, and each Obligor are in compliance with the terms and conditions of all such notices, permits, licenses and similar authorizations.

(d)    all Hazardous Substances, Solid Waste and Oil and Gas Waste, if any, generated at any and all Property of any Obligor have in the past been transported, treated and Disposed of in accordance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and, to the Knowledge of such Obligor, (i) all such transport carriers and treatment and Disposal facilities have been and are operating in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and (ii) are not the subject of any existing, pending or threatened action, investigation or inquiry by any Governmental Authority in connection with any Environmental Laws.

(e)    each Obligor has taken all steps reasonably necessary to determine and based on those steps has concluded that no Oil, Hazardous Substances, Solid Waste or Oil and Gas Waste, have been Disposed of or otherwise Released and there has been no Threatened Release of any Oil, Hazardous Substances, Solid Waste or Oil and Gas Waste on or to any Property of any Obligor except in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment.

11

(f)    to the extent applicable, all Property of each Obligor currently satisfies all design, operation, and equipment requirements imposed by the OPA, and such Obligor or such Subsidiary does not have any reason to believe that such Property, to the extent subject to the OPA, will not be able to maintain compliance with the OPA requirements during the term of this Agreement.

(g)    none of the Obligors or any Subsidiary has any known contingent liability in connection with any Release or Threatened Release of any Oil, Hazardous Substance, Solid Waste or Oil and Gas Waste into the environment.

**8.7.    Compliance with Laws and Agreements; No Defaults.**

(a)    Each Obligor is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    None of the Obligors is in default nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default or would require such Obligor to Redeem or make any offer to Redeem under any indenture, note, credit agreement or instrument pursuant to which any Material Indebtedness is outstanding or by which such Obligor or any of its Properties is bound.

(c)    No Default has occurred and is continuing.

**8.8.    Investment Company Act.** None of the Obligors is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

**8.9.    Taxes.** Except as disclosed on the attached Schedule 8.9 (which shall apply for the purposes of this entire Section 8.9), each Obligor has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested, or deferred as to payment resolution, in good faith by appropriate proceedings and for which such Obligor has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The charges, accruals and reserves on the books of the Obligors in respect of Taxes and other governmental charges are, in the reasonable opinion of such Obligor, adequate. No Tax Lien has been filed and, to the Knowledge of each Obligor, no claim is being asserted with respect to any such Tax or other such governmental charge.

**8.10.    ERISA.**

(a)    The Obligors, the Subsidiaries and each ERISA Affiliate have complied in all material respects with ERISA and, where applicable, the Code regarding each Plan.

12

(b)   Each Plan is, and has been, maintained in substantial compliance with ERISA and, where applicable, the Code.

(c)   No act, omission or transaction has occurred which could result in imposition on any Obligor, any Subsidiary or any ERISA Affiliate (whether directly or indirectly) of (i) either a civil penalty assessed pursuant to subsections (c), (i) or (l) of section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (ii) breach of fiduciary duty liability damages under section 409 of ERISA.

(d)   No Plan (other than a defined contribution plan) or any trust created under any such Plan has been terminated since September 2, 1974. No liability to the PBGC (other than for the payment of current premiums which are not past due) by any Obligor, any Subsidiary or any ERISA Affiliate has been or is expected by any Obligor, any Subsidiary or any ERISA Affiliate to be incurred with respect to any Plan. No ERISA Event with respect to any Plan has occurred.

(e)   Full payment when due has been made of all amounts which any Obligor, any Subsidiary or any ERISA Affiliate is required under the terms of each Plan or applicable law to have paid as contributions to such Plan as of the date hereof, and no accumulated funding deficiency (as defined in section 302 of ERISA and section 412 of the Code), whether or not waived, exists with respect to any Plan.

(f)   The actuarial present value of the benefit liabilities under each Plan which is subject to Title IV of ERISA does not, as of the end of the Company's most recently ended fiscal year, exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities. The term "actuarial present value of the benefit liabilities" shall have the meaning specified in section 4041 of ERISA.

(g)   Neither the Obligors, the Subsidiaries nor any ERISA Affiliate sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by an Obligor, a Subsidiary or any ERISA Affiliate in its sole discretion at any time without any material liability.

(h)   Neither the Obligors, the Subsidiaries nor any ERISA Affiliate sponsors, maintains or contributes to, or has at any time in the six-year period preceding the date hereof sponsored, maintained or contributed to, any Multiemployer Plan.

(i)   Neither the Obligors, the Subsidiaries nor any ERISA Affiliate is required to provide security under section 401(a)(29) of the Code due to a Plan amendment that results in an increase in current liability for the Plan.

8.11.   **Disclosure; No Material Misstatements.**   Each Obligor has disclosed to each Purchaser all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect in view of the circumstances as of the date on which the representations and warranties in this Section 8 are made or deemed to be made

13

(including, without limitation, the date on which each Subsequent Advance is funded pursuant to the provisions hereof). None of the other reports, financial statements, certificates or other information furnished by or on behalf of any Obligor to any Purchaser or any of their Affiliates in connection with the negotiation of this Agreement or any other Note Document or delivered hereunder or under any other Note Document (as modified or supplemented by other information so furnished) taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Obligors represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time. There is no fact peculiar to any Obligor which could reasonably be expected to have a Material Adverse Effect or in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in this Agreement or the Note Documents or the other documents, certificates and statements furnished to the Purchasers by or on behalf of any Obligor prior to, or on, the date hereof in connection with the transactions contemplated hereby.

**8.12. Insurance.** The Obligors have (a) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Obligor and the Subsidiaries. The Administrative Agent (for the benefit of the Purchasers) has been named as an additional insured in respect of such liability insurance policies and the Administrative Agent (for the benefit of the Purchasers) has been named as loss payee with respect to Property loss insurance, if any. The Company has complied with all applicable insurance requirements set forth in the License Agreement.

**8.13. Equity Interests, etc.** Set forth on Schedule 8.13, is a complete and accurate description of the authorized Equity Interests of the Company, by class, and, as of the Closing Date, a description of the number of shares of each such class that are issued and outstanding. Other than as described on Schedule 8.13, there are no subscriptions, options, warrants, or calls granted by the Company relating to any shares of the Company's Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument. The Company is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Equity Interests or any security convertible into or exchangeable for any of its Equity Interests. All of the outstanding Equity Interests of the Company has been validly issued and is fully paid and non-assessable. As of the Closing Date, the Company has no Subsidiaries other than Bio-Hydration UK, Ltd.

**8.14. Location of Business and Offices.** The Company's jurisdiction of organization is the State of California; the name of the Company as listed in the public records of its jurisdiction of organization is "Penta Water Company, Inc."; and the organizational identification number of the Company in its jurisdiction of organization is 2136525 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to Section 22 in accordance with Section 10.1(k). The Company's principal place of business and chief executive offices are located at the address specified in Section 22 (or as set forth in a notice delivered pursuant to Section 22 and Section 10.1(k)).

14

### 8.15.  Properties; Title, etc..

(a)    Except as disclosed on the attached Schedule 8.15 (which shall apply for the purposes of this entire Section 8.15), each of the Obligors has good and defensible title to all its Properties, in each case, free and clear of all Liens except Liens permitted by Section 11.2.

(b)    All material leases and agreements necessary for the conduct of the business of the Obligors are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, which could reasonably be expected to have a Material Adverse Effect.

(c)    The rights and Properties presently owned, leased or licensed by the Obligors including, without limitation, all easements and rights of way, include all rights and Properties necessary to permit the Obligors to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.

(d)    All of the Properties of the Obligors which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards.

(e)    Each Obligor owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by such Obligor does not, to the Company's Knowledge, infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Each Obligor either owns or has valid licenses or other rights to use all technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business similar to that of such Obligor.

### 8.16.  Maintenance of Properties.

Except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Properties of each Obligor have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all contracts related to such Properties. All Property owned in whole or in part by any Obligor that are necessary to conduct normal operations of such Obligor are being maintained in a state adequate to conduct such normal operations, and with respect to such of the foregoing which are operated by any Obligor, in a manner consistent with such Obligor's past practices (other than those the failure of which to maintain in accordance with this Section 8.16 could not reasonably be expected to have a Material Adverse Effect in view of the circumstances as of the date on which the representations and warranties in this Section 8 are made or deemed to be made, including, without limitation, the date on which each Subsequent Advance is funded pursuant to the provisions hereof).

### 8.17.  Swap Agreements.

No Obligor is a party to a Swap Agreement as of the date on which the representations and warranties in this Section 8 are made or deemed to be made,

15

including, without limitation, the date on which each Subsequent Advance is funded pursuant to the provisions hereof.

### 8.18. Use of Proceeds of Notes.

(a)    The proceeds of the Notes shall be used (i) to make a payment of $1,000,000 to terminate the royalty payment obligations of the Company under the License Agreement to AquaPhotonics, Inc.; (ii) to repay some of the outstanding Debt and Capital Leases of the Company with the understanding that the Company will retain some Debt as permitted by section 11.1; (iii) to pay the costs, fees (including any applicable Transaction Fees) and expenses incurred in connection with the transactions described in this Agreement, which shall be in amounts acceptable to the Administrative Agent; and (iv) for general corporate purposes.

(b)    None of the Obligors is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board). No part of the proceeds from the sale of the Notes hereunder will be used, directly or indirectly, for the purpose of buying or carrying any margin stock within the meaning of Regulation U of the Board (12 CFR 221), or for the purpose of buying or carrying or trading in any securities under such circumstances as to involve any Obligor in a violation of Regulation X of the Board (12 CFR 224) or to involve any broker or dealer in a violation of Regulation T of the Board (12 CFR 220). Margin stock does not constitute more than 24% of the value of the consolidated assets of any Obligor and none of the Obligors have any present intention that margin stock will constitute more than 24% of the value of such assets. As used in this Section, the terms "margin stock" and "purpose of buying or carrying" shall have the meanings assigned to them in said Regulation U.

### 8.19. Solvency.

After giving effect to the transactions contemplated hereby, (a) the Obligors and their Consolidated Subsidiaries, taken as a whole, will not have incurred or intended to incur, and will not believe that it will incur, Debt beyond its ability to pay such Debt (after taking into account the timing and amounts of cash to be received by each Obligor and its Consolidated Subsidiaries and the amounts to be payable on or in respect of its liabilities, and giving effect to amounts that could reasonably be received by reason of indemnity, offset, insurance or any similar arrangement) as such Debt becomes absolute and matures and (b) the Obligors and their Consolidated Subsidiaries will not have (and will have no reason to believe that it will have thereafter) unreasonably small capital for the conduct of its business.

### 8.20. Labor Matters.

No labor dispute with the employees of any Obligor exists or, to the Knowledge of the any Obligor, is imminent, that in each case could reasonably be expected to cause a Material Adverse Effect.

### 8.21. Material Contracts.

Schedule 8.21 sets forth a description of each of the Obligors' Material Contracts. The Obligors have delivered a true, correct and complete copy of the Material Contracts to the Administrative Agent on or before the date hereof. None of the Obligors are in breach of or in default under any Material Contract and have not received any written notice of default or non-performance from the other party or any written notice of the intention of any other party thereto to terminate or suspend any Material Contract.

16

**8.22.   Private Offering by the Company.**  Neither the Company or nor anyone acting on its behalf has offered the Notes or any similar securities for sale to, or solicited any offer to buy any of the same from, or otherwise approached or negotiated in respect thereof with, any person other than the Purchasers and not more than 10 other Institutional Investors, each of which has been offered the Notes at a private sale for investment.  Neither the Company nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to the registration requirements of Section 5 of the Securities Act or to the registration requirements of any securities or blue sky laws of any applicable jurisdiction.

**8.23.   Foreign Asset Control Regulations, etc..**

(a)      Neither the sale of the Notes by the Company hereunder nor its use of the proceeds thereof will violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

(b)      None of the Obligors (i) is a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order or (ii) engages in any dealings or transactions with any such Person.  The Obligors are in compliance, in all material respects, with the USA Patriot Act.

(c)      No part of the proceeds from the sale of the Notes hereunder will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, assuming in all cases that such Act applies to the Obligors.

**9.     REPRESENTATIONS OF THE PURCHASER.**

**9.1.   Purchase for Investment.**  Each Purchaser severally represents that it is purchasing the Notes for its own account or for one or more separate accounts maintained by such Purchaser or for the account of one or more pension or trust funds and not with a view to the distribution thereof, provided that the disposition of such Purchaser's or their property shall at all times be within such Purchaser's or their control.  Each Purchaser understands that the Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Company is not required to register the Notes.

**9.2.   Source of Funds.**  Each Purchaser severally represents that at least one of the following statements is an accurate representation as to each source of funds (a "*Source*") to be used by such Purchaser to fund the Advances to be funded by such Purchaser hereunder:

(a)      the Source is an "insurance company general account" (as the term is defined in the United States Department of Labor's Prohibited Transaction Exemption ("*PTE*") 95-60) in respect of which the reserves and liabilities (as defined by the annual statement for life

17

insurance companies approved by the NAIC (the *"NAIC Annual Statement"*)) for the general account contract(s) held by or on behalf of any employee benefit plan together with the amount of the reserves and liabilities for the general account contract(s) held by or on behalf of any other employee benefit plans maintained by the same employer (or affiliate thereof as defined in PTE 95-60) or by the same employee organization in the general account do not exceed 10% of the total reserves and liabilities of the general account (exclusive of separate account liabilities) plus surplus as set forth in the NAIC Annual Statement filed with such Purchaser's state of domicile; or

(b)    the Source is a separate account that is maintained solely in connection with such Purchaser's fixed contractual obligations under which the amounts payable, or credited, to any employee benefit plan (or its related trust) that has any interest in such separate account (or to any participant or beneficiary of such plan (including any annuitant)) are not affected in any manner by the investment performance of the separate account; or

(c)    the Source is either (i) an insurance company pooled separate account, within the meaning of PTE 90-1 or (ii) a bank collective investment fund, within the meaning of the PTE 91-38 and, except as disclosed by such Purchaser to the Company in writing pursuant to this clause (c), no employee benefit plan or group of plans maintained by the same employer or employee organization beneficially owns more than 10% of all assets allocated to such pooled separate account or collective investment fund; or

(d)    the Source constitutes assets of an "investment fund" (within the meaning of Part V of PTE 84-14 (the *"QPAM Exemption"*)) managed by a "qualified professional asset manager" or "QPAM" (within the meaning of Part V of the QPAM Exemption), no employee benefit plan's assets that are included in such investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Section V(c)(1) of the QPAM Exemption) of such employer or by the same employee organization and managed by such QPAM, exceed 20% of the total client assets managed by such QPAM, the conditions of Part I(c) and (g) of the QPAM Exemption are satisfied, neither the QPAM nor a person controlling or controlled by the QPAM (applying the definition of "control" in Section V(e) of the QPAM Exemption) owns a 5% or more interest in the Company and (i) the identity of such QPAM and (ii) the names of all employee benefit plans whose assets are included in such investment fund have been disclosed to the Company in writing pursuant to this clause (d); or

(e)    the Source constitutes assets of a "plan(s)" (within the meaning of Section IV of PTE 96-23 (the *"INHAM Exemption"*)) managed by an "in-house asset manager" or "INHAM" (within the meaning of Part IV of the INHAM exemption), the conditions of Part I(a), (g) and (h) of the INHAM Exemption are satisfied, neither the INHAM nor a person controlling or controlled by the INHAM (applying the definition of "control" in Section IV(d) of the INHAM Exemption) owns a 5% or more interest in the Company and (i) the identity of such INHAM and (ii) the name(s) of the employee benefit plan(s) whose assets constitute the Source have been disclosed to the Company in writing pursuant to this clause (e); or

(f)    the Source is a governmental plan; or

18

(g)   the Source is one or more employee benefit plans, or a separate account or trust fund comprised of one or more employee benefit plans, each of which has been identified to the Company in writing pursuant to this clause (g); or

(h)   . the Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA.

As used in this Section 9.2, the terms *"employee benefit plan,"* *"governmental plan,"* and *"separate account"* shall have the respective meanings assigned to such terms in section 3 of ERISA.

**10.   AFFIRMATIVE COVENANTS.**   Until the Commitments have expired or been terminated and the principal of and accrued interest with respect to each of the Notes and all fees payable hereunder and all other amounts payable under the Note Documents shall have been paid in full, each Obligor covenants and agrees with the Holders that:

**10.1.   Financial Statements; Ratings Change; Other Information.** The Obligors will furnish (or cause to be furnished) to the Administrative Agent and each Purchaser:

(a)   <u>Annual Financial Statements</u>.  As soon as available, but in any event in accordance with then applicable law and not later than 120 days after the end of each fiscal year of each of the Company (provided that, if the Company, using commercially reasonable efforts, cannot produce such financial statements during such 120 day time period, then such time period will be extended to no later than 150 days after the end of each fiscal year of the Company, except in the case of financial statements for fiscal year ended December 31, 2006, which shall be provided to the Administrative Agent within 2 Business Days of the Company's receipt of such financial statements), the Company's audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year and for the relevant Budget, all reported on by J. H. Cohn & Company or other independent public accountants reasonably acceptable to the Required Holders (and, beginning with the fiscal year ending December 31, 2007) without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Company and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied.

(b)   <u>Monthly Financial Statements</u>.  As soon as available, but not later than 20 days after the end of each of the first eleven months of each fiscal year of the Company, the Company's consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such month and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year and for the relevant Budget, all certified by one of the Company's Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Company its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

19

(c)     Certificate of Financial Officer -- Compliance.  Concurrently with any delivery of financial statements under Section 10.1(a) or Section 10.1(b), a certificate of a Financial Officer of the Company in substantially the form of Exhibit 5.9 hereto (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) identifying any material variations from the relevant Budget, and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements first delivered to the Administrative Agent and each Purchaser pursuant to Section 10.1(a) and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(d)     Other Accounting Reports.  Promptly upon receipt thereof, a copy of each other report or letter submitted to any Obligor or any Subsidiary by independent accountants in connection with any annual, interim or special audit made by them of the books of any such Obligor or any such Subsidiary, and a copy of any response by any such Obligor or any such Subsidiary, or the governing body of any such Obligor or any such Subsidiary, to such letter or report.

(e)     SEC and Other Filings; Reports to Shareholders.  Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Obligor or any Subsidiary with the SEC, or with any national securities exchange, or distributed by any Obligor to its shareholders generally, as the case may be.

(f)     Notices Under Material Instruments.  Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement, other than this Agreement and not otherwise required to be furnished to the Holders pursuant to any other provision of this Section 10.1.

(g)     Monthly Cash Flow Forecast.  By no later than three Business Days prior to the beginning of each calendar month, the Company shall deliver (or cause to be delivered) to the Administrative Agent a projected cash flow forecast for such month.

(h)     Quarterly Management Financial Package.  By no later than 30 days after the end of each fiscal quarter of the Company, the Company shall deliver (or cause to be delivered) to the Administrative Agent a management financial package and discussion, which shall be in form and substance reasonably acceptable to the Administrative Agent.

(i)     Notice of Casualty Events.  Prompt written notice, and in any event within three Business Days, of the occurrence of any Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event.

(j)     Information Regarding Obligors.  Prompt written notice (and in any event within thirty (30) days prior thereto) of any change (i) in any Obligor's, corporate name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its Properties, (ii) in the location of any Obligor's chief executive office or principal place of business, (iii) in any Obligor's identity or corporate structure or in the jurisdiction in which such

20

Person is incorporated or formed, (iv) in any Obligor's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization, and (v) in any Obligor's federal taxpayer identification number.

(k)   <u>Notices of Certain Changes</u>.  Promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the certificate or articles of incorporation, by-laws, any preferred stock designation or any other organic document of any Obligor or any Subsidiary

(l)   <u>Budget</u>.  By no later than 30 days before the end of each calendar year, the Company shall deliver (or cause to be delivered) to each Holder (a) a Budget for the Obligors and their Subsidiaries for the following calendar year, which Budget shall (i) reflect monthly expenditures and income and otherwise be in a form reasonably satisfactory to the Required Holders, and (ii) be subject to the approval of the Required Holders, and (b) financial projections prepared by the Company's management covering the Company's next three fiscal years.

(m)   <u>Other Requested Information</u>.  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Obligor or any Subsidiary (including, without limitation, any Plan or Multiemployer Plan and any reports or other information required to be filed under ERISA), or compliance with the terms of this Agreement or any other Note Document, as the Administrative Agent may reasonably request.

### 10.2.   Notice of Material Events.

The Obligors will furnish (or cause to be furnished) to the Administrative Agent and each Purchaser prompt written notice of the following:

(a)   the occurrence of any Default;

(b)   the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Company or any Affiliate thereof not previously disclosed in writing to the Administrative Agent and each Purchaser or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Administrative Agent) that, in either case, if adversely determined, could reasonably be expected to result in liability in excess of $100,000;

(c)   the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Obligors and the Subsidiaries in an aggregate amount exceeding $200,000; and

(d)   any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect of which the Company has Knowledge.

Each notice delivered under this Section 10.2 shall be accompanied by a statement of a Responsible Officer of the Obligors setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

21

**10.3.  Existence; Conduct of Business.**  The Obligors will, and will cause each Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, consents, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Properties are located or the ownership of its Properties requires such qualification, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**10.4.  Material Contracts.**  The Obligors will, and will cause each Subsidiary to, (i) observe and perform all of the material terms, covenants, conditions and provisions of each Material Contract to be observed and performed by it, except to the extent the failure to do so could not reasonably be expected to result in a Material Adverse Effect, (ii) not do, permit, suffer or refrain from doing anything that could reasonably be expected to result in a default under or breach of any of the terms of any Material Contract, to the extent the foregoing could reasonably be expected to result in a Material Adverse Effect, (iii) not cancel, or surrender any Material Contract except in the ordinary course of its business or except as such Material Contract expires in accordance with its terms or except to the extent that such cancellation or surrender could not reasonably be expected to result in a Material Adverse Effect, and (iv) give the Administrative Agent prompt written notice of any material breach of any obligation, or any default, by any such Obligor or any such Subsidiary, or the Knowledge of any such Obligor or such Subsidiary of any other party, under any Material Contract, and deliver to the Administrative Agent a copy of each notice of default.

**10.5.  Payment of Obligations.**  Each Obligor will, and will cause each Subsidiary to, pay its obligations, including Tax liabilities of each Obligor and each Subsidiary before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Obligor or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect or result in the seizure or levy of any Property of such Obligor or any Subsidiary.

**10.6.  Performance of Obligations under Note Documents.**  The Company will pay the Notes according to the reading, tenor and effect thereof, and the Obligors will, and will cause each Subsidiary to, do and perform every act and discharge all of the obligations to be performed and discharged by them under the Note Documents, including, without limitation, this Agreement, at the time or times and in the manner specified.

**10.7.  Operation and Maintenance of Properties.**  The Obligors, at their own expense, will, and will cause each Subsidiary to operate its material Properties or cause such material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable pro ration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the business of the Obligors and the Subsidiaries, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect.

22

**10.8.  Insurance.**  The Obligors will, and will cause each Subsidiary to have, (a) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Obligor and the Subsidiaries.  Without limiting the foregoing, the Company shall at all times comply with the applicable insurance requirements set forth in the License Agreement.

**10.9.  Books and Records; Inspection Rights.**  Each Obligor will, and will cause each Subsidiary to, keep proper books of record and account in accordance with GAAP.  Each Obligor will, and will cause each Subsidiary to, permit any representatives designated by the Required Holders, upon reasonable prior notice (which in the case of an examination of the expenditures and receipts related to the Budget, shall be no more than two calendar days' notice), to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

**10.10.  Compliance with Laws.**  Each Obligor will, and will cause each Subsidiary to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property (including ERISA, USA Patriot Act, and Environmental Laws), except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**10.11.  Guarantors.**  If the Company forms or acquires any Subsidiaries, the Company shall promptly cause such Subsidiary to guarantee the Guarantied Obligations pursuant to the provisions of Section 14 of this Agreement.  In connection with any such guaranty, the Company shall, or shall cause such Subsidiary to, (a) execute and deliver a supplement to this Agreement as required by the Administrative Agent, and (b) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

**10.12.  Board Observation Rights.**  The Company shall give the Administrative Agent reasonable prior written or telephonic notice of any meeting of the Company's Board of Directors or any committee or executive session thereof (together with the delivery to the Administrative Agent of any material provided to the Board members in connection therewith), and the Administrative Agent shall have the right (but not the obligation), at the Administrative Agent's expense, for its representatives to attend and observe each such meeting in a non-voting capacity, it being understood that informal telephonic meetings of members of the Company's Board of Directors (or any committee thereof) may be held from time to time on matters not materially and directly affecting the interests of the Holders of the Notes and that no notice of such informal telephonic meetings shall be due to the Administrative Agent.

**10.13.  Post Closing Requirements.**  By no later than sixty (60) days after the Closing Date, the Company shall have provided to the Administrative Agent and each Purchaser financial projections of the Company's management covering the next two fiscal years of the Company.

**10.14. ERISA Compliance.** The Obligors will promptly furnish and will cause the Subsidiaries and any ERISA Affiliate to promptly furnish to the Administrative Agent (a) promptly after the filing thereof with the United States Secretary of Labor, the Internal Revenue Service or the PBGC, copies of each annual and other report with respect to each Plan or any trust created thereunder, (b) immediately upon becoming aware of the occurrence of any ERISA Event or of any "prohibited transaction," as described in section 406 of ERISA or in section 4975 of the Code, in connection with any Plan or any trust created thereunder, a written notice signed by the President or the principal Financial Officer of such Obligor, such Subsidiary or such ERISA Affiliate, as the case may be, specifying the nature thereof, what action such Obligor, such Subsidiary or such ERISA Affiliate is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto, and (c) immediately upon receipt thereof, copies of any notice of the PBGC's intention to terminate or to have a trustee appointed to administer any Plan. With respect to each Plan (other than a Multiemployer Plan), each Obligor will, and will cause the Subsidiaries and each ERISA Affiliate to, (i) satisfy in full and in a timely manner, without incurring any late payment or underpayment charge or penalty and without giving rise to any lien, all of the contribution and funding requirements of section 412 of the Code (determined without regard to subsections (d), (e), (f) and (k) thereof) and of section 302 of ERISA (determined without regard to sections 303, 304 and 306 of ERISA), and (ii) pay, or cause to be paid, to the PBGC in a timely manner, without incurring any late payment or underpayment charge or penalty, all premiums required pursuant to sections 4006 and 4007 of ERISA.

**10.15. Further Assurances.** The Obligors at their sole expense will, and will cause each Subsidiary to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of any Obligor or any Subsidiary, as the case may be, in the Note Documents, including the Notes.

**11.    NEGATIVE COVENANTS.** Until the Commitments have expired or been terminated and the principal of and interest on each Note and all fees payable hereunder and all other amounts payable under the Note Documents have been paid in full, each Obligor covenants and agrees with the Holders that:

**11.1.    Debt.** The Obligors will not, and will not permit any Subsidiary to, incur, create, assume or suffer to exist any Debt, except the following (herein referred to as the *"Permitted Indebtedness"*):

> (a)    the Notes or other Indebtedness arising under the Note Documents or any guaranty of or suretyship arrangement for the Notes or other Indebtedness arising under the Note Documents.

> (b)    Debt of the Obligors existing on the Closing Date and disclosed to the Purchasers on Schedule 11.1 hereto, and any Permitted Refinancing Debt in respect thereof.

24

(c)     accounts payable and accrued expenses, liabilities or other obligations to pay the deferred purchase price of Property or services, from time to time incurred in the ordinary course of business which are not greater than ninety (90) days past the date of invoice or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP.

(d)     Debt under Capital Leases entered into after the Closing Date (and any Permitted Refinancing Debt in respect thereof), which Debt and Permitted Refinancing Debt shall not exceed $200,000 in the aggregate at any one time outstanding.

(e)     Debt under lease obligations entered into after the Closing Date (and any Permitted Refinancing Debt in respect thereof) that are permitted under Section 11.7.

(f)     Debt associated with bonds or surety obligations required by Governmental Requirements in connection with the operation of the Properties of the Obligors and the Subsidiaries.

(g)     intercompany Debt between any Obligor and any Subsidiary or between Obligors or between Subsidiaries to the extent permitted by this Section 11.1; provided that such Debt is not held, assigned, transferred, negotiated or pledged to any Person other than an Obligor, and, provided further, that any such Debt owed by any Obligor shall be subordinated to the Indebtedness on terms set forth in the Guaranty Agreement.

(h)     endorsements of negotiable instruments for collection in the ordinary course of business.

(i)     Debt secured by real property that is acquired after the Effective Date, provided that the amount of such Debt does not exceed $200,000 in the aggregate at any one time outstanding.

(j)     demand letters of credit in an amount not to exceed $100,000, in connection with the purchase by the Obligors of inventory and equipment related to the Obligors' business operations.

(k)     any Debt in which the Administrative Agent is given the first offer to provide, but declines to provide so long as the proceeds of such Debt are used to repay in full (and not in part) the Indebtedness, provided that if, after the Administrative Agent has declined to provide such Debt, the terms of such Debt are modified in any material respect that is more favorable to the lender providing such Debt, then the Administrative Agent shall again be given an offer to provide such Debt;

(l)     other Debt not to exceed $250,000 in the aggregate at any one time outstanding.

**11.2.   Liens.**

25

       (a)    The Obligors will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except for the following (herein referred to as the *"Permitted Liens"*):

       (i)    Liens securing the payment of any Indebtedness.

       (ii)    Liens existing on the Closing Date and disclosed to the Purchasers on Schedule 11.2 hereto, which Liens secure Debt permitted by Section 11.1(b), provided that any such Liens securing any Permitted Refinancing Debt under Section 11.1(b) shall not cover any additional or different Property not securing the Refinanced Debt.

       (iii)    Excepted Liens.

       (iv)    Liens securing Capital Leases permitted by Section 11.1(d) but only on the Property under lease.

       (v)    Liens securing Debt permitted by Section 11.1(i), 11.1(k) and 11.1(l).

       (b)    The Company will not create, incur, assume or permit to exist any Lien on the Company's patent agreement/rights with AquaPhotonics, Inc. under the License Agreement or on the Company's trademarks except:

       (i)    Liens securing the payment of any Indebtedness.

       (ii)    Permitted IP Liens.

**11.3.  Restricted Payments, etc..**  None of the Obligors will, nor will the Obligors permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make any distribution of its Property to its Equity Interest holders, except (a) the Obligors may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Capital Stock), and (b) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests.

**11.4.  Investments, Loans and Advances.**  The Obligors will not, and will not permit any Subsidiary to, make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

       (a)    accounts receivable arising in the ordinary course of business.

       (b)    direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, in each case maturing within one year from the date of creation thereof.

       (c)    commercial paper maturing within one year from the date of creation thereof rated in the highest grade by S&P or Moody's.

26

(d)    deposits maturing within one year from the date of creation thereof with, including certificates of deposit issued by, any office located in the United States of any other bank or trust company which is organized under the laws of the United States or any state thereof, has capital, surplus and undivided profits aggregating at least $100,000,000 (as of the date of such bank or trust company's most recent financial reports) and has a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time, by S&P or Moody's, respectively.

(e)    deposits in money market funds investing exclusively in Investments described in Section 11.4(b), Section 11.4(c) or Section 11.4(d).

(f)    Investments (i) made by any Obligor in or to another Obligor or to the Guarantors that are Wholly-Owned Subsidiaries, and (ii) made by any Subsidiary in or to any Obligor or any Guarantor that is a Wholly-Owned Subsidiary.

(g)    loans and advances to directors, officers and employees permitted by applicable law not to exceed $100,000 in the aggregate at any time.

(h)    Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 11.4 owing to any Obligor or any Subsidiary as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of any Obligor or any Subsidiary; provided that the Obligors shall give the Administrative Agent and each Purchaser prompt written notice in the event that the aggregate amount of all investments held at any one time under this Section 11.4(h) exceeds $50,000.

(i)    other Investments not to exceed $100,000 in the aggregate during any fiscal year of the Obligors.

**11.5.  Nature of Business.**  The Obligors will not, and will not permit any Subsidiary to, allow any material change to be made in the character of its business as manufacturing and marketing premium water products with enhanced hydration and purification characteristics.

**11.6.  Prepayments.**  The Obligors will not, and will not permit any Subsidiary to

(a)    optionally prepay, redeem, defease, purchase, or otherwise acquire any Debt of any Obligor or any Subsidiary, other than the Indebtedness in accordance with this Agreement, other than equipment leases of $100,000 or less in the aggregate; or

(b)    make any payment on account of Debt that has been contractually subordinated in right of payment if such payment is not permitted at such time under the subordination terms and conditions.

**11.7.  Limitation on Leases.**  The Obligors will not, and will not permit any Subsidiary to, create, incur, assume or suffer to exist (a) any obligation for the payment of rent or hire of Property of any kind whatsoever (real or personal but excluding Capital Leases), under leases or lease agreements, or (b) any Permitted Refinancing Debt in respect of the obligations described in the preceding clause (b), which, in each case, would cause the aggregate amount of all

27

payments made by the Obligors and Subsidiaries pursuant to all such leases, lease agreements (including, without limitation, any residual payments at the end of any lease) and all such Permitted Refinancing Debt, to exceed, in the case of the obligations described in the preceding clauses (a) and (b) in the aggregate, $2,000,000 in any period of twelve consecutive calendar months during the life of such leases or Permitted Refinancing Debt (as the case may be).

**11.8.    Proceeds of Notes.**  The Company will not permit the proceeds of the Notes to be used for any purpose other than those permitted by Section 8.18.  None of the Obligors nor any Person acting on behalf of the Obligors has taken or will take any action which might cause any of the Note Documents to violate Regulations T, U or X or any other regulation of the Board or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  If requested by the Required Holders, the Obligors will furnish to each Holder a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

**11.9.    ERISA Compliance.**  The Obligors will not, and will not permit any Subsidiary to, at any time:

(a)    engage in, or permit any ERISA Affiliate to engage in, any transaction in connection with which an Obligor, a Subsidiary or any ERISA Affiliate could be subjected to either a civil penalty assessed pursuant to subsections (c), (i) or (l) of section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code.

(b)    terminate, or permit any ERISA Affiliate to terminate, any Plan in a manner, or take any other action with respect to any Plan, which could result in any liability of an Obligor, a Subsidiary or any ERISA Affiliate to the PBGC.

(c)    fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, an Obligor, a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto.

(d)    permit to exist, or allow any ERISA Affiliate to permit to exist, any accumulated funding deficiency within the meaning of section 302 of ERISA or section 412 of the Code, whether or not waived, with respect to any Plan.

(e)    permit, or allow any ERISA Affiliate to permit, the actuarial present value of the benefit liabilities under any Plan maintained by an Obligor, a Subsidiary or any ERISA Affiliate which is regulated under Title IV of ERISA to exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities. The term "actuarial present value of the benefit liabilities" shall have the meaning specified in section 4041 of ERISA.

(f)    contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any Multiemployer Plan.

28

(g)    acquire, or permit any ERISA Affiliate to acquire, an interest in any Person that causes such Person to become an ERISA Affiliate with respect to an Obligor or a Subsidiary or with respect to any ERISA Affiliate of an Obligor or a Subsidiary if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to, (i) any Multiemployer Plan, or (ii) any other Plan that is subject to Title IV of ERISA under which the actuarial present value of the benefit liabilities under such Plan exceeds the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities.

(h)    incur, or permit any ERISA Affiliate to incur, a liability to or on account of a Plan under sections 515, 4062, 4063, 4064, 4201 or 4204 of ERISA.

(i)    contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any material liability.

(j)    amend, or permit any ERISA Affiliate to amend, a Plan resulting in an increase in current liability such that an Obligor, a Subsidiary or any ERISA Affiliate is required to provide security to such Plan under section 401(a)(29) of the Code.

**11.10.  Sale of Discount of Receivables.**  Except for receivables obtained by any Obligor or any Subsidiary out of the ordinary course of business or the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction, the Obligors will not, and will not permit any Subsidiary to, discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

**11.11.  Mergers, etc.**  The Obligors will not, and will not permit any Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "*consolidation*"), or liquidate or dissolve, provided that, notwithstanding the foregoing, any Subsidiary may participate in a consolidation with (a) the Company (provided that the Company shall be the continuing or surviving Person), (b) any other Subsidiary provided that (i) if one of such parties to the consolidation is an Obligor, such Obligor shall be the continuing or surviving Person, and (ii) if one of such Subsidiaries is a Wholly-Owned Subsidiary, then the surviving Person shall be a Wholly-Owned Subsidiary, or (c) the Company may participate in a consolidation so long as (i) the Company or the shareholders of the Company prior to such consolidation own more than fifty percent (50%) of the ownership interests of the surviving Person, which surviving Person shall be the Company, and (ii) both immediately before and after giving effect to such consolidation, no Default shall exist hereunder.

29

**11.12. Sale of Properties.** The Obligors will not, and will not permit any Subsidiary to, sell, assign, convey or otherwise transfer any Property except for (a) the sale of inventory in the ordinary course of business; (b) the sale or transfer of equipment that is no longer necessary for the business of such Obligor or such Subsidiary or is replaced by equipment of at least comparable value and use; and (c) sales and other dispositions of Properties not regulated by Sections 11.12(a) and (b) having a fair market value not to exceed $350,000 during any 12-month period.

**11.13. Environmental Matters.** The Obligors will not, and will not permit any Subsidiary to, cause or permit any of its Property to be in violation of any Environmental Law to the extent that such violations could reasonably be expected to have a Material Adverse Effect.

**11.14. Subsidiaries.** Except upon the prior written consent of the Administrative Agent, none of the Obligors will, or will permit any Subsidiary to, form or acquire any new Subsidiaries. The Obligors shall not, and shall not permit any Subsidiary to, sell, assign or otherwise dispose of any Equity Interests in any Subsidiary.

**11.15. Terrorism Sanctions Regulations.** The Obligors will not, and will not permit any Subsidiary to, become a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti Terrorism Order or engage in any dealings or transactions with any such Person.

**11.16. Dividend Restrictions.** The Obligors will not, and will not permit any Subsidiary to, create, incur, assume or suffer to exist any contract, agreement or understanding which in any way prohibits or restricts any Subsidiary from paying dividends or making distributions to any Obligor, or which requires the consent of or notice to other Persons in connection therewith.

**11.17. Swap Agreements.** The Obligors will not, and will not permit any Subsidiary, to enter into any Swap Agreements with any Person.

**11.18. Sale and Leaseback.** The Obligors will not, and will not permit any Subsidiary, to enter into any arrangement with any Person where any Obligor or any Subsidiary is the lessee of real or personal property which has been or is to be sold or transferred by such Obligor or such Subsidiary to such Person (or to any other Person to whom funds have been or are to be advanced by such Person) on the security of such property or rental obligations of such Obligor or such Subsidiary unless such lease is permitted under Section 11.1.

**11.19. Transactions with Affiliates.** Except as disclosed on Schedule 11.19, the Obligors will not, and will not permit any Subsidiary to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than Wholly-Owned Subsidiaries) unless such transactions are otherwise expressly permitted under this Agreement or are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate.

**11.20. Amendment, etc. of Material Contracts.** The Obligors will not, and will not permit any Subsidiary to suspend, cancel or terminate any Material Contract or consent to or accept any cancellation, suspension or termination thereof, amend, modify or change in any

manner any term or condition of any Material Contract or give any consent, waiver or approval thereunder, waive any default under or any breach of any term or condition of any Material Contract, or take any other action in connection with any Material Contract that in each case described in this Section 11.20 would reasonably be expected to have a Material Adverse Effect.

**11.21. Amendment of Organizational Documents.** The Obligors will not, and will not permit any Subsidiary, to amend any of its Organizational Documents other than any such amendment (a) made solely in connection with a transaction that is otherwise permitted under this Agreement or (b) that would not reasonably be expected to have a Material Adverse Effect.

**11.22. Financial Covenants.** The Company will not permit its Adjusted Consolidated EBITDA, calculated for the immediately preceding 12 months, to be less than the following amounts as of the last day of each of the following time periods:

| Fiscal Time Period | Minimum Adjusted Consolidated EBITDA |
|---|---|
| Fiscal Year ending December 31, 2007 | $900,000 |
| Fiscal Quarter ending March 31, 2008 | $1,000,000 |
| Calendar Month ending April 30, 2008 | $1,000,000 |
| Calendar Month ending May 31, 2008 | $1,000,000 |
| Fiscal Quarter ending June 30, 2008 | $1,100,000 |
| Calendar Month ending July 31, 2008 | $1,100,000 |
| Calendar Month ending August 31, 2008 | $1,100,000 |
| Fiscal Quarter ending September 30, 2008 | $1,250,000 |
| Calendar Month ending October 31, 2008 | $1,250,000 |
| Calendar Month ending November 30, 2008 | $1,250,000 |
| Fiscal Year ending December 31, 2008 | $1,300,000 |
| Fiscal Quarter ending March 31, 2009 | $1,400,000 |
| Fiscal Quarter ending June 30, 2009 | $1,700,000 |
| Fiscal Quarter ending September 30, 2009 | $2,000,000 |
| Fiscal Year ending December 31, 2009 | $2,300,000 |
| Fiscal Quarter ending March 31, 2010 | $2,400,000 |

31

| | |
|---|---|
| Fiscal Quarter ending June 30, 2010 | $2,500,000 |
| Fiscal Quarter ending September 30, 2010 | $2,600,000 |
| Fiscal Year ending December 31, 2010 | $2,700,000 |
| Fiscal Quarter ending March 31, 2011 | $2,800,000 |
| Fiscal Quarter ending June 30, 2011 | $2,900,000 |
| Fiscal Quarter ending September 30, 2011 | $3,000,000 |
| Fiscal Year ending December 30, 2011 | $3,000,000 |
| Fiscal Quarter ending March 31, 2012 | $3,000,000 |

**12.    EVENTS OF DEFAULT.**   One or more of the following events shall constitute an *"Event of Default"*:

        (a)      the Company shall fail to pay any principal of any Note when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by duly declared acceleration or otherwise.

        (b)      the Company or any other Obligor shall fail to pay any interest on any Note (after giving fully effect to the PIK option of the Company under Section 7.6(a) of this Agreement) or any fee (in the case of the Commitment Fees, after fully giving effect to the PIK option of the Company under Section 7.7(b) of this Agreement) or any other amount (other than an amount referred to in Section 12(a)) payable under any Note Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days.

        (c)      any representation or warranty made or deemed made by or on behalf of any Obligor or any Subsidiary in or in connection with any Note Document or any amendment or modification of any Note Document or waiver under such Note Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Note Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made.

        (d)      (i) any Obligor or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 10.2, Section 10.3, Section 10.12, Section 10.13, or in Section 11 (other than Section 11.2); or (ii) the Company shall fail to perform the covenants and agreements set forth in Section 10.1(l) and such failure shall continue unremedied for a period of 5 days after notice thereof from any Holder to the Company; or (iii) any Obligor shall fail to observe or perform the covenants and agreements set forth in Section 11.2 and such failure shall continue unremedied for a period of 10 Business Days after the earlier to occur of

32

(A) notice thereof from any Holder to the Obligors or (B) a Responsible Officer of such Obligor or such Subsidiary otherwise becomes aware of such failure.

(e)    any Obligor or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 12(a), Section 12(b) or Section 12(d)) or any other Note Document, and such failure shall continue unremedied for a period of 30 days after the earlier to occur of (i) notice thereof from any Holder to the Obligors or (ii) a Responsible Officer of such Obligor or such Subsidiary otherwise becomes aware of such failure.

(f)    any Obligor or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable and such failure shall continue beyond any applicable grace period.

(g)    any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of such Material Indebtedness or any trustee or agent on its or their behalf to cause such Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require any Obligor or any Subsidiary to make an offer in respect thereof.

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Obligor or any Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Obligor or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 30 days or an order or decree approving or ordering any of the foregoing shall be entered.

(i)    any Obligor or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 12(h), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Obligor or any Subsidiary or for a substantial part of any of their respective assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing.

(j)    any Obligor or any Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due.

33

(k)      (i) one or more judgments for the payment of money in an aggregate amount in excess of $350,000 or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against any Obligor, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Obligor or any Subsidiary to enforce any such judgment.

(l)      the Note Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against any Obligor that is party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or any Obligor or any Subsidiary or any of their Affiliates shall so state in writing.

(m)      any uninsured loss, casualty or other uninsured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of any Obligor or any Subsidiary having a fair market value in excess of 300,000.

(n)      an ERISA Event shall have occurred that, in the opinion of the Required Holders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Obligors and their Subsidiaries in an aggregate amount exceeding (i) $200,000 in any year or (ii) $400,000 for all periods.

(o)      a Material Adverse Effect shall occur.

## 13.    REMEDIES ON DEFAULT, ETC.

### 13.1.  Acceleration.

(a)      If an Event of Default with respect to any Obligor or any Subsidiary described in Section 12(h) or Section 12(i) has occurred, the Commitments shall immediately terminate and all the Notes then outstanding shall automatically become immediately due and payable.

(b)      If any other Event of Default has occurred and is continuing, the Administrative Agent may (and upon the written request of the Required Holders shall) at any time, by notice or notices to the Company, terminate the Commitments and/or declare all the Notes then outstanding to be immediately due and payable.

(c)      If any Event of Default described in Section 12(a) or Section 12(b) has occurred and is continuing, the Administrative Agent may (and upon the written request of the Required Holders shall) at any time, by notice or notices to the Company, terminate all the Holders' Commitments and declare all the Notes then outstanding to be immediately due and payable.

34

(d)    Upon any Notes becoming due and payable under this Section, whether automatically or by declaration, such Notes will forthwith mature and the entire unpaid principal amount of such Notes, plus (i) all accrued and unpaid interest thereon, and (ii) all fees, expense reimbursements obligations and other obligations of each Obligor accrued hereunder and under the Notes and the other Note Documents, shall all be immediately due and payable, in each and every case without presentment, demand, protest or further notice, all of which are hereby waived.

(e)    All proceeds received from the Obligors after maturity of the Notes, whether by acceleration or otherwise, shall be applied:

(i)    *first*, to payment or reimbursement of that portion of the Indebtedness constituting reasonable fees, reasonable expenses and indemnities payable to the Administrative Agent in its capacity as such;

(ii)    *second*, pro rata to payment or reimbursement of that portion of the Indebtedness constituting reasonably fees, reasonable expenses and indemnities payable to each Purchaser;

(iii)    *third*, pro rata to payment of accrued interest on the Notes;

(iv)    *fourth*, pro rata to payment of principal outstanding on the Notes;

(v)    *fifth*, pro rata to any other Indebtedness; and

(vi)    *sixth*, any excess, after all of the Indebtedness shall have been indefeasibly paid in full in cash, shall be paid to the Company or as otherwise required by any Governmental Requirement.

**13.2.    Other Remedies.**

If any Default or Event of Default has occurred and is continuing, and irrespective of whether any Notes have become or have been declared immediately due and payable under Section 13.1, the Administrative Agent may (and at the written request of the Required Holders shall) proceed to protect and enforce the rights of the Holders by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in any Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise.

**13.3.    Rescission.**

At any time after any Notes have been declared due and payable pursuant to clause (b) or (c) of Section 13.1, the Administrative Agent may (and at the written request of the Required Holders shall) rescind and annul any such declaration and its consequences if (a) the Company has paid all overdue interest on the Notes, all principal of any Notes that is due and payable and is unpaid other than by reason of such declaration, and all interest on such overdue

35

principal and (to the extent permitted by applicable law) overdue interest in respect of the Notes, at the Default Rate, (b) all Events of Default and Defaults, other than non-payment of amounts that have become due solely by reason of such declaration, have been cured or have been waived pursuant to Section 19.1, and (c) no judgment or decree has been entered for the payment of any monies due pursuant hereto or to the Notes. No rescission and annulment under this Section 13.3 will extend to or affect any subsequent Event of Default or Default or impair any right consequent thereon.

### 13.4. No Waivers or Election of Remedies, Expenses, etc.

No course of dealing and no delay on the part of the Administrative Agent or any Holder of any Note in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice the Administrative Agent's or such Holder's rights, powers or remedies. No right, power or remedy conferred by this Agreement or by any Note upon the Administrative Agent or any Holder thereof shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise. Without limiting the obligations of the Company under Section 17, the Company will pay to the Administrative Agent and each Purchaser on demand such further amount as shall be sufficient to cover all reasonable costs and expenses of the Administrative Agent and such Purchaser incurred in any enforcement or collection under this Section 13, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

## 14. GUARANTIES; SUBORDINATION OF OBLIGOR CLAIMS.

### 14.1. Guaranties.

(a) Each of the Guarantors hereby jointly and severally, unconditionally and irrevocably, guarantees to the Holders and each of their respective successors, indorsees, transferees and assigns, the prompt and complete payment in cash and performance by the Obligors when due (whether at the stated maturity, by acceleration or otherwise) of the Guarantied Obligations. This is a guarantee of payment and not collection and the liability of each Guarantor is primary and not secondary.

(b) Anything herein or in any other Note Document to the contrary notwithstanding, the maximum liability of each Guarantor hereunder and under the other Note Documents shall in no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established in Section 14.2).

(c) Each Guarantor agrees that the Guarantied Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this Section 14 or affecting the rights and remedies of any Holder under this Section 14.

(d) Each Guarantor agrees that if the maturity of the Guarantied Obligations is accelerated by bankruptcy or otherwise, such maturity shall also be deemed accelerated for the purpose of this guarantee without demand or notice to such Guarantor. The guarantee contained

36

in this Section 14 shall remain in full force and effect until all the Guarantied Obligations shall have been satisfied by payment in full in cash.

(e)    No payment made by any Obligor, any of the Guarantors, any other guarantor or any other Person or received or collected by any Holder from any Obligor, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Guarantied Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Guarantied Obligations or any payment received or collected from such Guarantor in respect of the Guarantied Obligations), remain liable for the Guarantied Obligations up to the maximum liability of such Guarantor hereunder until the Guarantied Obligations are paid in full in cash.

**14.2.    Right of Contribution.**    Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share (based on the number of Guarantors) of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 14.3. The provisions of this Section 14.2 shall in no respect limit the obligations and liabilities of any Guarantor to the Holders, and each Guarantor shall remain liable to the Holders for the full amount guaranteed by such Guarantor hereunder.

**14.3.    No Subrogation.**    Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by any Holder, no Guarantor shall be entitled to be subrogated to any of the rights of any Holder against any Obligor or any other Guarantor or any collateral security or guarantee or right of offset held by any Holder for the payment of the Guarantied Obligations, nor shall any Guarantor seek or be entitled to seek any indemnity, exoneration, participation, contribution or reimbursement from any Obligor or any other Guarantor in respect of payments made by such Guarantor hereunder, until all amounts owing to the Holders on account of the Guarantied Obligations are irrevocably and indefeasibly paid in full in cash. If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Guarantied Obligations shall not have been irrevocably and indefeasibly paid in full in cash, such amount shall be held by such Guarantor in trust for the Holders, and shall, forthwith upon receipt by such Guarantor, be turned over to the Holders in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Holders, if required), to be applied against the Guarantied Obligations, whether matured or unmatured, in accordance with Section 7.4 of this Agreement.

**14.4.    Amendments, etc. with respect to the Guarantied Obligations.**    Each Guarantor shall remain obligated hereunder, and such Guarantor's obligations hereunder shall not be released, discharged or otherwise affected, notwithstanding that, without any reservation of rights against any Guarantor and without notice to, demand upon or further assent by any Guarantor (which notice, demand and assent requirements are hereby expressly waived by such Guarantor), (a) any demand for payment of any of the Guarantied Obligations made by any Holder may be rescinded by such Holder or otherwise and any of the Guarantied Obligations continued; (b) the Guarantied Obligations, the liability of any other Person upon or for any part

37

thereof or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by, or any indulgence or forbearance in respect thereof granted by, any Holder; (c) any Note Document may be amended, modified, supplemented or terminated, in whole or in part, as the Holders may deem advisable from time to time; (d) any collateral security, guarantee or right of offset at any time held by any Holder for the payment of the Guarantied Obligations may be sold, exchanged, waived, surrendered or released; (e) any additional guarantors, makers or endorsers of the Guarantied Obligations may from time to time be obligated on the Guarantied Obligations or any additional security or collateral for the payment and performance of the Guarantied Obligations may from time to time secure the Guarantied Obligations; and (f) any other event shall occur which constitutes a defense or release of sureties generally. No Holder shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Guarantied Obligations or for the guarantee contained in this Section 14 or any Property subject thereto.

**14.5. Waivers.** Each Guarantor hereby waives any and all notice of the creation, renewal, extension or accrual of any of the Guarantied Obligations and notice of or proof of reliance by any Holder upon the guarantee contained in this Section 14 or acceptance of the guarantee contained in this Section 14; the Guarantied Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Section 14 and no notice of creation of the Guarantied Obligations or any extension of credit already or hereafter contracted by or extended to any Obligor need be given to any Guarantor; and all dealings between any of the Obligors and any of the Guarantors, on the one hand, and the Holders, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Section 14. Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon any of the Obligors or any of the Guarantors with respect to the Guarantied Obligations.

**14.6. Guaranty Absolute and Unconditional.**

(a)    Each Guarantor understands and agrees that the guarantee contained in this Section 14 is, and shall be construed as, a continuing, completed, absolute and unconditional guarantee of payment, and each Guarantor hereby waives any defense of a surety or guarantor or any other obligor on any obligations arising in connection with or in respect of any of the following and hereby agrees that its obligations hereunder shall not be discharged or otherwise affected as a result of, any of the following:

(i)    the invalidity or unenforceability of any Note Document, any of the Guarantied Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by any Holder;

(ii)    any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Obligor or any other Person against any Holder;

38

(iii)    the insolvency, bankruptcy arrangement, reorganization, adjustment, composition, liquidation, disability, dissolution or lack of power of any Obligor or any other Guarantor or any other Person at any time liable for the payment of all or part of the Guarantied Obligations, including any discharge of, or bar or stay against collecting, any Guarantied Obligation (or any part of them or interest therein) in or as a result of such proceeding;

(iv)    any sale, lease or transfer of any or all of the assets of any Obligor or any other Guarantor, or any changes in the shareholders of any Obligor or the Guarantor;

(v)    any change in the corporate existence (including its constitution, laws, rules, regulations or power), structure or ownership of any Obligor or any other Guarantor;

(vi)    the fact that any collateral or Lien contemplated or intended to be given, created or granted as security for the repayment of the Guarantied Obligations shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other Lien, it being recognized and agreed by each of the Guarantors that it is not entering into this Agreement in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guarantied Obligations;

(vii)    the absence of any attempt to collect the Guarantied Obligations or any part of them from any Obligor or any Guarantor;

(viii)    (A) any Holder's election, in any proceeding instituted under chapter 11 of the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code; (B) any borrowing or grant of a Lien by any Obligor, as debtor-in-possession, or extension of credit, under Section 364 of the Bankruptcy Code; (C) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of any Holder's claim (or claims) for repayment of the Guarantied Obligations; (D) any use of cash collateral under Section 363 of the Bankruptcy Code; (E) any agreement or stipulation as to the provision of adequate protection in any bankruptcy proceeding; (F) the avoidance of any Lien in favor of the Holders or any of them for any reason; or (G) failure by any Holder to file or enforce a claim against any Obligor or its estate in any bankruptcy or insolvency case or proceeding; or

(ix)    any other circumstance or act whatsoever, including any action or omission of the type described in Section 13.4 (with or without notice to or Knowledge of any Obligor or such Guarantor), which constitutes, or might be construed to constitute, an equitable or legal discharge of the Obligors for the Guarantied Obligations, or of such Guarantor under the guarantee contained in this Section 14, in bankruptcy or in any other instance (other than payment or performance).

(b)    When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, any Holder may, but shall be under no obligation to, join or make a similar demand on or otherwise pursue or exhaust such rights and remedies as it may have against any Obligor, any other Guarantor or any other Person or against any collateral security or guarantee for the Guarantied Obligations or any right of offset with respect thereto, and any failure by any Holder to make any such demand, to pursue such other rights or remedies

39

or to collect any payments from any Obligor, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of any Obligor, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of any Holder against any Guarantor. For the purposes hereof *"demand"* shall include the commencement and continuance of any legal proceedings.

14.7.   **Reinstatement.**  The guarantee contained in this Section 14 shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Guaranteed Obligations is rescinded or must otherwise be restored or returned by any Holder upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Obligor or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Obligor or any Guarantor or any substantial part of its Property, or otherwise, all as though such payments had not been made.

14.8.   **Payments.**  Each Guarantor hereby guarantees that payments under this Section 14 will be paid to the Holders, without set-off, deduction or counterclaim in dollars, in immediately available funds, at the offices specified in Section 14.1 of this Agreement.

14.9.   **Representations and Warranties.**  In the case of each Guarantor, the representations and warranties set forth in Section 9 of this Agreement as they relate to such Guarantor or to the Note Documents to which such Guarantor is a party are true and correct in all respects, provided that each reference in each such representation and warranty to the Obligors' or the Company's Knowledge shall, for the purposes of this Section 14.9, be deemed to be a reference to such Guarantor's Knowledge.

14.10.   **Affirmative and Negative Covenants.**  In the case of each Guarantor, such Guarantor shall take, or shall refrain from taking, as the case may be, each action that is necessary to be taken or not taken, as the case may be, so that no Default is caused by the failure to take such action or to refrain from taking such action by such Guarantor or any of its subsidiaries.

14.11.  **Subordination of Obligor Claims.**

(a)    Subordination of all Obligor Claims.  After and during the continuation of an Event of Default, no Obligor shall receive or collect, directly or indirectly, from any obligor in respect thereof any amount upon the Obligor Claims.

(b)    Claims in Bankruptcy.  In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving any Obligor, the Holders shall have the right to prove their claim in any proceeding, so as to establish their rights hereunder and receive directly from the receiver, trustee or other court custodian, dividends and payments which would otherwise be payable upon Obligor Claims. Each Obligor hereby assigns such dividends and payments to the Holders for application against the Guaranteed Obligations as provided under Section 7.4 of this Agreement. Should any Holder receive, for application upon the Obligations, any such dividend or payment which is otherwise

40

payable to any Obligor, and which, as between such Obligors, shall constitute a credit upon the Obligor Claims, then upon payment in full in cash of the Guaranteed Obligations, the intended recipient shall become subrogated to the rights of the Holders to the extent that such payments to the Holders on the Obligor Claims have contributed toward the liquidation of the Obligations, and such subrogation shall be with respect to that proportion of the Obligations which would have been unpaid if the Holders had not received dividends or payments upon the Obligor Claims.

        (c)    Payments held in Trust.    In the event that notwithstanding Section 14.11(a) and Section 14.11(b), any Obligor should receive any funds, payments, claims or distributions which is prohibited by such Sections, then it agrees: (i) to hold in trust for the Holders an amount equal to the amount of all funds, payments, claims or distributions so received, and (ii) that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions except to pay them promptly to the Holders; and each Obligor covenants promptly to pay the same to the Holders.

        (c)    Liens Subordinate.    Each Obligor agrees that, until the Guaranteed Obligations are paid in full in cash, any Liens securing payment of the Obligor Claims shall be and remain inferior and subordinate to any Liens securing payment of the Indebtedness, regardless of whether such encumbrances in favor of such Obligor or any Holder presently exist or are hereafter created or attach. Without the prior written consent of the Required Holders, no Obligor, during the period in which any of the Guaranteed Obligations are outstanding, shall (i) exercise or enforce any creditor's right it may have against any debtor in respect of the Obligor Claims, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceeding (judicial or otherwise, including without limitation the commencement of or joinder in any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any Lien held by it.

        (d)    Notation of Records.    Upon the request of the Required Holders, all promissory notes and all accounts receivable ledgers or other evidence of the Obligor Claims accepted by or held by any Obligor shall contain a specific written notice thereon that the indebtedness evidenced thereby is subordinated under the terms of this Agreement.

## 15.    REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES.

### 15.1.    Registration of Notes.

The Company shall keep at its principal executive office a register for the registration and registration of transfers of Notes. The name and address of each Holder of one or more Notes, each transfer thereof and the name and address of each transferee of one or more Notes shall be registered in such register. Prior to due presentment for registration of transfer, the Person in whose name any Note shall be registered shall be deemed and treated as the owner and Holder thereof for all purposes hereof, and the Company shall not be affected by any notice or knowledge to the contrary. The Company shall give to any Holder of a Note that is an Institutional Investor promptly upon request therefor, a complete and correct copy of the names and addresses of all registered Holders of Notes.

41

### 15.2. Transfer and Exchange of Notes.

Upon surrender of any Note at the principal executive office of the Company for registration of transfer or exchange (and in the case of a surrender for registration of transfer, duly endorsed or accompanied by a written instrument of transfer duly executed by the registered Holder of such Note or his attorney duly authorized in writing and accompanied by the address for notices of each transferee of such Note or part thereof), the Company shall execute and deliver, at the Company's expense (except as provided below), one or more new Notes (as requested by the Holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note. Each such new Note shall be payable to such Person as such Holder may request and shall be substantially in the form of Exhibit 1. Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest shall have been paid thereon. The Company may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes. Notes shall not be transferred in denominations of less than $250,000, provided that if necessary to enable the registration of transfer by a Holder of its entire holding of Notes, one Note may be in a denomination of less than $250,000. Any transferee, by its acceptance of a Note registered in its name (or the name of its nominee), shall be deemed to have made the representation set forth in Section 9.2.

### 15.3. Replacement of Notes.

Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note (which evidence shall be, in the case of an Institutional Investor, notice from such Institutional Investor of such ownership and such loss, theft, destruction or mutilation), and

    (a)   in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it (provided that if the Holder of such Note is, or is a nominee for, an original Purchaser or another Holder of a Note with a minimum net worth of at least $10,000,000, such Person's own unsecured agreement of indemnity shall be deemed to be satisfactory), or

    (b)   in the case of mutilation, upon surrender and cancellation thereof,

within ten (10) Business Days thereafter, the Company at its own expense shall execute and deliver, in lieu thereof, a new Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon.

## 16. PAYMENTS ON NOTES.

### 16.1. Place of Payment.

Notwithstanding anything to the contrary contained herein or in any other Note Document, payments of principal, interest, and fees, and all other amounts due an payable under the provisions of the Notes and the other Note Documents are required to be paid to a bank account of each Holder maintained by such Holder in the city of New York, New York.

42

## 17.    EXPENSES, TAXES, ETC.

### 17.1.    Expenses; Indemnity; Damage Waiver.

(a)    Subject to the limitations set forth below, the Company shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, including, without limitation, the reasonable fees, charges and disbursements of counsel and other outside consultants for the Administrative Agent, photocopy, mailing, courier, telephone and other similar expenses, and the cost of reasonable environmental audits and surveys and appraisals, in connection with the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent and the Purchasers as a group as to the rights and duties of the Administrative Agent and such Purchaser with respect thereto) of this Agreement and the other Note Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable costs, expenses, Taxes, assessments and other charges incurred by the Administrative Agent and each Purchaser in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any other document referred to herein, and (iii) all reasonable out-of-pocket expenses incurred by the Administrative Agent and each Purchaser, including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent and each Purchaser, in connection with the enforcement or protection of the Administrative Agent's or such Purchaser's rights in connection with this Agreement or any other Note Document, including its rights under this Section 17.1, including, without limitation, all such reasonable out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the amounts outstanding under the Notes.  Notwithstanding the foregoing, in no event shall the Company be obligated to pay more than an aggregate of $75,000 for all of the expenses incurred by the Administrative Agent and each Purchaser prior to the Closing Date under Sections 17.1(a)(i) and Sections 17.1(a)(ii) above.

(b)    THE COMPANY SHALL INDEMNIFY THE ADMINISTRATIVE AGENT, EACH PURCHASER, AND EACH RELATED PARTY OF THE ADMINISTRATIVE AGENT AND/OR EACH PURCHASER (EACH SUCH PERSON BEING CALLED AN *"INDEMNITEE"*) AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (i) THE NEGOTIATION, EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE OBLIGORS AND THE SUBSIDIARIES THEREOF OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR UNDER ANY OTHER NOTE DOCUMENT OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER NOTE DOCUMENT, (ii) THE FAILURE OF THE COMPANY OR ANY SUBSIDIARY TO COMPLY WITH THE TERMS OF ANY NOTE DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (iii) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY

43

WARRANTY OR COVENANT OF THE OBLIGORS SET FORTH IN ANY OF THE NOTE DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (iv) THE USE OF THE PROCEEDS FROM ANY NOTE, (v) THE OPERATIONS OF THE BUSINESS OF THE OBLIGORS AND THE SUBSIDIARIES BY THE OBLIGORS AND THE SUBSIDIARIES, (vi) ANY ENVIRONMENTAL LAW APPLICABLE TO ANY OBLIGOR OR ANY SUBSIDIARY OR ANY OF THEIR PROPERTIES, INCLUDING WITHOUT LIMITATION, THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON ANY OF THEIR PROPERTIES, (vii) THE BREACH OR NON-COMPLIANCE BY ANY OBLIGOR OR ANY SUBSIDIARY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO ANY OBLIGOR OR ANY SUBSIDIARY, (viii) THE PAST OWNERSHIP BY ANY OBLIGOR OR ANY SUBSIDIARY OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (ix) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY ANY OBLIGOR OR ANY SUBSIDIARY OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY OBLIGOR OR ANY SUBSIDIARY, (x) ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY OBLIGOR OR ANY SUBSIDIARY, (xi) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE NOTE DOCUMENTS, OR (xii) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING WITHOUT LIMITATION, ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE.

       (c)    To the extent permitted by applicable law, the Obligors shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Note Document or any

44

agreement or instrument contemplated hereby or thereby, the Transactions, or the use of the proceeds thereof.

All amounts due under this Section 17.1 shall be payable not later than thirty (30) days after written demand therefor, unless the Company in good faith disputes in writing within such period the Indemnitee's right to indemnification or the amount of such claim.

### 17.2. Taxes.

(a)     Payments Free of Taxes. Any and all payments by or on account of any obligation of any Obligor under any Note Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if any Obligor shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 17.2(a)), each Holder receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Obligor shall make such deductions and (iii) such Obligor shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     Payment of Other Taxes by the Obligors. The Obligors shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Indemnification by the Obligors. The Obligors shall indemnify each Holder, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such Holder on or with respect to any payment by or on account of any obligation of the Obligors hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 17.2) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate of a Holder as to the amount of such payment or liability under this Section 17.2 (with all accompanying back-up documentation as may be reasonably requested by the Obligor) shall be delivered to the Obligors with such Holder's written demand for indemnification hereunder and shall be conclusive absent manifest error.

(d)     Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by an Obligor to a Governmental Authority, the Obligors shall deliver to the relevant Holder the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Holder.

(e)     Foreign Holders. No Holder is a Foreign Holder as of the Closing Date or any Holder that is a Foreign Holder is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Obligor is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement or any other Note Document and such Foreign Holder shall deliver to such Obligor, at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by

45

applicable law or reasonably requested by such Obligor as will permit such payments to be made without withholding or at a reduced rate.

(g) <u>Treatment of Certain Refunds</u>. If any Holder determines, in its reasonable discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by any Obligor or with respect to which any Obligor has paid additional amounts pursuant to this Section, it shall pay to such Obligor an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Obligor under this Section with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Holder, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that each Obligor, upon the request of Holder, agrees to repay the amount paid over to such Obligor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Holder in the event such Holder is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require any Holder to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Obligor or any other Person.

### 17.3. Survival.

The obligations of the Obligors under this Section 17 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement or the Notes, and the termination of this Agreement, until the applicable statute of limitations on such Indemnified Taxes or Other Taxes has expired.

## 18. SURVIVAL; REVIVAL; REINSTATEMENT; ENTIRE AGREEMENT.

(a) All covenants, agreements, representations and warranties made by the Obligors herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Note Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the issuance of the Notes, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Purchaser may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Note or any fee or any other amount payable under this Agreement is outstanding and unpaid. The provisions of Section 17 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Notes, or the termination of this Agreement, any other Note Document or any provision hereof or thereof, until the applicable statute of limitations has expired.

(b) To the extent that any payments on the Indebtedness are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Indebtedness so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Holder's Liens, security interests, rights, powers and remedies under this Agreement and each Note Document shall continue in

46

full force and effect. In such event, each Note Document shall be automatically reinstated and the Obligors shall take such action as may be reasonably requested by any Holder to effect such reinstatement.

(c) **THIS AGREEMENT AND THE OTHER NOTE DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

## 19. AMENDMENT AND WAIVER.

### 19.1. Requirements.

This Agreement and the Notes may be amended, and the observance of any term hereof or of the Notes may be waived (either retroactively or prospectively), with (and only with) the written consent of the Company and the Required Holders, except that (a) no amendment or waiver of any of the provisions of Section 2, 3, 4, 5, 6, 7, 9 or 23 hereof, or any defined term (as it is used therein), will be effective as to any Purchaser unless consented to by such Purchaser in writing, and (b) no such amendment or waiver may, without the written consent of the Purchaser or Holder of each Note at the time outstanding affected thereby, (i) subject to the provisions of Section 13 relating to acceleration or rescission, change the amount or time of any prepayment or payment of principal of, or reduce the rate or change the time of payment or method of computation of interest on the Notes, (ii) change the percentage of the principal amount of the Notes the Holders of which are required to consent to any such amendment or waiver, (iii) amend any of Sections 7, 12(a), 12(b), 13, 17 or 19, or (iv) increase the Commitment or the Maximum Credit Amount of any Holder or Purchaser.

### 19.2. Solicitation of Holders of Notes.

(a) <u>Solicitation</u>. The Company will provide each Holder of the Notes (irrespective of the amount of Notes then owned by it) with sufficient information, sufficiently far in advance of the date a decision is required, to enable such Holder to make an informed and considered decision with respect to any proposed amendment, waiver or consent in respect of any of the provisions hereof or of the Notes. Notwithstanding the foregoing, each Holder shall use commercially reasonable efforts to respond with its decision regarding any proposed amendment, waiver or consent within fifteen (15) Business Days of its receipt of a written request for the proposed amendment, waiver or consent, and if a Holder fails to respond within such time period, such Holder shall be deemed to have declined the proposed amendment, waiver or consent. The Company will deliver executed or true and correct copies of each amendment, waiver or consent effected pursuant to the provisions of this Section 19 to each Holder of outstanding Notes promptly following the date on which it is executed and delivered by, or receives the consent or approval of, the requisite Holders of Notes.

(b) <u>Payment</u>. The Company will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security, to any Holder of Notes as consideration for or as an inducement to the

entering into by any Holder of Notes or any waiver or amendment of any of the terms and provisions hereof unless such remuneration is concurrently paid, or security is concurrently granted, on the same terms, ratably to each Holder of Notes then outstanding even if such Holder did not consent to such waiver or amendment.

### 19.3. Binding Effect, etc.

Any amendment or waiver consented to as provided in this Section 19 applies equally to all Holders of Notes and is binding upon them and upon each future Holder of any Note and upon the Company without regard to whether such Note has been marked to indicate such amendment or waiver. No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon. No course of dealing between any Company, on the one hand, and the Holder of any Note, on the other, nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any Holder of such Note.

### 19.4. Notes held by Company, etc.

Solely for the purpose of determining whether the Holders of the requisite percentage of the aggregate principal amount of Notes then outstanding approved or consented to any amendment, waiver or consent to be given under this Agreement or the Notes, or have directed the taking of any action provided herein or in the Notes to be taken upon the direction of the Holders of a specified percentage of the aggregate principal amount of Notes then outstanding, Notes directly or indirectly owned by the Company or any of the Company's Affiliates shall be deemed not to be outstanding.

## 20. REPRODUCTION OF DOCUMENTS.

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by the Purchasers at the Closing (except the Notes themselves), and (c) financial statements, certificates and other information previously or hereafter furnished to each Purchaser, may be reproduced by such Purchaser by any photographic, photostatic, microfilm, microcard, miniature photographic or other similar process and such Purchaser may destroy any original document so reproduced. The Company agrees and stipulates that, to the extent permitted by applicable law, any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by such Purchaser in the regular course of business) and any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence. This Section 19 shall not prohibit the Company or any other Holder of Notes from contesting any such reproduction to the same extent that it could contest the original, or from introducing evidence to demonstrate the inaccuracy of any such reproduction.

## 21. CONFIDENTIAL INFORMATION.

The Administrative Agent and each of the Holders agrees that, without the prior consent of the Company, it will use its best efforts not to disclose any information with respect to the Obligor which is furnished pursuant to this Agreement, any other Note Document or any

48

documents contemplated by or referred to herein or therein and which is designated by the Company to the Administrative Agent and the Holders in writing as confidential or as to which it is otherwise reasonably clear such information is not public, except that any Holder and the Administrative Agent may disclose any such information (a) to its employees, Affiliates, auditors and counsel, advisors or to another Holder, (b) as has become generally available to the public other than by a breach of this Section 21, (c) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Holder or the Administrative Agent or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or the Office of the Comptroller of the Currency, the NAIC, the SVO or similar organizations (whether in the United States or elsewhere) or their successors, (d) as may be required or appropriate in response to any summons or subpoena or any law, order, regulation or ruling applicable to such Holder or such Administrative Agent, (e) to any prospective Participant or assignee in connection with any contemplated transfer pursuant to Section 25.1; provided that such prospective transferee shall have been made aware of this Section 21 and shall have agreed to be bound by its provisions as if it were a party to this Agreement, (f) to Gold Sheets and other similar bank trade publications; such information to consist of deal terms and other information regarding the credit facilities evidenced by this Agreement customarily found in such publications, (g) in connection with any suit, action or proceeding for the purpose of defending itself, reducing its liability, or protecting or exercising any of its claims, rights, remedies or interests under or in connection with the Note Documents, (h) to a Person that is an investor or prospective investor in the Administrative Agent, any Holder or any Affiliate thereto, that, in each case, agrees that its access to information regarding the Company and the Notes is solely for purposes of evaluating an investment in such entity, (i) to a Person that is an investor or prospective investor in a Securitization (as defined below) that agrees that its access to information regarding the Company and the Notes is solely for purposes of evaluating an investment in such Securitization, (j) to a Person that is a trustee, collateral manager, servicer, noteholder or secured party in a Securitization in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization, or (k) to a nationally recognized rating agency that requires access to information regarding the Obligors, the Notes and the Note Documents in connection with ratings issued with respect to a Securitization. For purposes of this Section, *"Securitization"* means a public or private offering by a Holder or any of its Affiliates or their respective successors and assigns, of securities which represent an interest in, or which are collateralized, in whole or in part, by the Notes or the Note Documents.

## 22.    NOTICES.

All notices and communications provided for hereunder shall be in writing and sent (a) by telecopy if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), or (b) by registered or certified mail with return receipt requested (postage prepaid), or (c) by a recognized overnight delivery service (with charges prepaid). Any such notice must be sent:

(i)    if to any Purchaser or its nominee, to such Purchaser or nominee at the address specified for such communications in Schedule A, or at such other address as such Purchaser or nominee shall have specified to the Company in writing,

49

(ii)    if to any other Holder of any Note, to such Holder at such address as such other Holder shall have specified to the Company in writing, or

(iii)    if to the Company, to the Company at its address set forth at the beginning hereof to the attention of its Chief Executive Officer, or at such other address as the Company shall have specified to the Holder of each Note in writing with a copy to Procopio, Cory, Hargreaves & Savitch LLP, 550 B Street, Suite 2100, San Diego, California 92101, Attention: Michael J. Kinkelaar, Esq..

Notices under this Section 22 will be deemed given only when actually received.

## 23.    SUBSTITUTION OF PURCHASER.

Each Purchaser shall have the right to substitute any one of its Affiliates as the recipient of the Notes to be issued to such Purchaser hereunder, by written notice to the Company, which notice shall be signed by both such Purchaser and such Affiliate, shall contain such Affiliate's agreement to be bound by this Agreement and shall contain a confirmation by such Affiliate of the accuracy with respect to it of the representations set forth in Section 9. Upon receipt of such notice, wherever the word "Purchaser" is used in this Agreement (other than in this Section 23), such word shall be deemed to refer to such Affiliate in lieu of such Purchaser. In the event that such Affiliate is so substituted as a purchaser hereunder and such Affiliate thereafter transfers to such Purchaser all of the Notes then held by such Affiliate, upon receipt by the Company of notice of such transfer, wherever the word "Purchaser" is used in this Agreement (other than in this Section 23), such word shall no longer be deemed to refer to such Affiliate, but shall refer to such Purchaser, and such Purchaser shall have all the rights of an original Holder of the Notes under this Agreement.

## 24.    ADMINISTRATIVE AGENT.

### 24.1.    Appointment; Powers.

Each of Purchasers hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of the Note Documents, together with such actions and powers as are reasonably incidental thereto.

### 24.2.    Duties and Obligations of Administrative Agent.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Note Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, and (c) except as expressly set forth in the Note Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Obligor or any Subsidiary that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to

50

the Administrative Agent by the Company or a Holder, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Note Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Note Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Note Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Note Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Section 5, or Section 6 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of the Company and the Subsidiaries or any other obligor or guarantor, or (vii) any failure by the Company or any other Person (other than itself) to perform any of its obligations hereunder or under any other Note Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein.

### 24.3.   Action by Administrative Agent.

The Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Holders and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Note Documents unless it shall (a) receive written instructions from the Required Holders or the Holders, as applicable, specifying the action to be taken and (b) be indemnified to its satisfaction by the Holders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action. The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Holders. If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Holders in the written instructions (with indemnities) described in this Section 24.3, provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Holders. In no event, however, shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, the Note Documents or applicable law. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Holders or the Holders, and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Note Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct.

### 24.4.   Reliance by Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or

51

other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Company and each Purchaser hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent. The Administrative Agent may consult with legal counsel (who may be counsel for the Company), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

### 24.5.  Subagents.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding Sections of this Section 24 shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

### 24.6.  Resignation or Removal of Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this Section 24.6, the Administrative Agent may resign at any time by notifying the Holders and the Company, and the Administrative Agent may be removed at any time with or without cause by the Required Holders. Upon any such resignation or removal, the Required Holders shall have the right to appoint a successor Administrative Agent. If no successor shall have been so appointed by the Required Holders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation or removal of the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Holders, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The Administrative Agent shall not be paid any fees for its services as Administrative Agent. After the Administrative Agent's resignation hereunder, the provisions of this Section 24 and Section 17 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

### 24.7.  Administrative Agent as a Holder.

Each Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Holder as any other Holder and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and

generally engage in any kind of business with the Company or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

### 24.8.  No Reliance.

Each Holder acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Holder and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Note Document to which it is a party. Each Holder also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Holder and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Note Document, any related agreement or any document furnished hereunder or thereunder. The Administrative Agent shall not be required to keep itself informed as to the performance or observance by any Obligor or any Subsidiary of this Agreement, the Note Documents or any other document referred to or provided for herein or to inspect the Properties or books of the any Obligor or any Subsidiary. Except for notices, reports and other documents and information expressly required to be furnished to the Holders by the Administrative Agent under the Note Documents, the Administrative Agent shall not have any duty or responsibility to provide any Holder with any credit or other information concerning the affairs, financial condition or business of the Company (or any of its Affiliates) which may come into the possession of the Administrative Agent or any of its Affiliates.

### 25.  MISCELLANEOUS.

### 25.1.  Successors and Assigns.

All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including, without limitation, any subsequent Holder of a Note) whether so expressed or not. Without limitation of the foregoing, any Holder may, without the consent of any Obligor, assign or transfer its Notes (or any interest therein, including participations) to any other Person. Notwithstanding the foregoing, none of the Obligors may assign or transfer any of its rights or obligations under this Agreement or the other Note Documents without the prior written consent of the Administrative Agent and each Holder. Nothing herein shall prohibit any Holder from pledging or assigning any of its rights under the Note Documents (including, without limitation, any right to payment of principal and interest under any Note) to any Person, provided that (a) in the event that any Purchaser or Holder assigns its Commitment hereunder to a Person other than an Affiliate, then for so long as no Default or Event of Default exists and is continuing, such assignment of such Commitment shall require the consent of the Company, such consent not to be unreasonably withheld or delayed, and (b) no Purchaser or Holder shall assign all or any part of its Notes to a direct competitor of the Company except upon the prior written consent of the Company.

### 25.2.  Payments Due on Non-Business Days.

53

Anything in this Agreement or the Notes to the contrary notwithstanding, any payment of principal of or interest on any Note that is due on a date other than a Business Day shall be made on the next succeeding Business Day without including the additional days elapsed in the computation of the interest payable on such next succeeding Business Day; provided that if the maturity date of any Note is a date other than a Business Day, the payment otherwise due on such maturity date shall be made on the next succeeding Business Day and shall include the additional days elapsed in the computation of interest payable on such next succeeding Business Day.

### 25.3.  Severability.

Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

### 25.4.  Construction.

Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant. Where any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

### 25.5.  Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.

### 25.6.  USA Patriot Act Notice.

Each Purchaser hereby notifies the Company that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Company, which information includes the name and address of the Company and other information that will allow such Purchaser to identify the Company in accordance with the USA Patriot Act.

### 25.7.  Interest Rate Limitation.

It is the intention of the parties hereto that each Holder shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby would be usurious as to any Holder under laws applicable to it (including the laws of the United States of America or any other jurisdiction whose laws may be mandatorily applicable to such Holder notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the

54

contrary in any of the Note Documents or any agreement entered into in connection with or as security for the Notes, it is agreed as follows: (a) the aggregate of all consideration which constitutes interest under law applicable to any Holder that is contracted for, taken, reserved, charged or received by such Holder under any of the Note Documents or agreements or otherwise in connection with the Notes shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Holder on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by such Holder to the Company); and (b) in the event that the maturity of the Notes is accelerated by reason of an election of the Holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Holder may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically and by such Holder as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Holder on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by such Holder to the Company). All sums paid or agreed to be paid to any Holder for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Holder, be amortized, prorated, allocated and spread throughout the stated term of the loans evidenced by the Notes until payment in full so that the rate or amount of interest on account of any loans hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (x) the amount of interest payable to any Holder on any date shall be computed at the Highest Lawful Rate applicable to such Holder pursuant to this Section 25.7 and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Holder would be less than the amount of interest payable to such Holder computed at the Highest Lawful Rate applicable to such Holder, then the amount of interest payable to such Holder in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Holder until the total amount of interest payable to such Holder shall equal the total amount of interest which would have been payable to such Holder if the total amount of interest had been computed without giving effect to this Section 25.7.

### 25.8. GOVERNING LAW; JURISDICTION; SERVICE OF PROCESS.

(a)    THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT UNITED STATES FEDERAL LAW PERMITS ANY HOLDER TO CONTRACT FOR, CHARGE, RECEIVE, RESERVE OR TAKE INTEREST AT THE RATE ALLOWED BY THE LAWS OF THE STATE WHERE SUCH HOLDER IS LOCATED.

(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE NOTE DOCUMENTS SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE

55

EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS. THIS SUBMISSION TO JURISDICTION IS NON-EXCLUSIVE AND DOES NOT PRECLUDE A PARTY FROM OBTAINING JURISDICTION OVER ANOTHER PARTY IN ANY COURT OTHERWISE HAVING JURISDICTION.

(c)     THE COMPANY HEREBY IRREVOCABLY DESIGNATES, APPOINTS AND EMPOWERS AND HEREBY CONFERS AN IRREVOCABLE SPECIAL POWER, AMPLE AND SUFFICIENT, TO CORPORATION SERVICE COMPANY, WITH OFFICES ON THE DATE HEREOF AT 1133 AVENUE OF THE AMERICAS, SUITE 3100, NEW YORK, NY, 10036, AS ITS DESIGNEE, APPOINTEE AND AGENT WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING IN NEW YORK TO RECEIVE, ACCEPT AND ACKNOWLEDGE FOR AND ON ITS BEHALF, AND IN RESPECT OF ITS PROPERTY, SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND DOCUMENTS WHICH MAY BE SERVED IN ANY SUCH PROCEEDING AND AGREES THAT THE FAILURE OF SUCH AGENT TO GIVE ANY ADVICE OF ANY SUCH SERVICE OF PROCESS TO THE COMPANY SHALL NOT IMPAIR OR AFFECT THE VALIDITY OF SUCH SERVICE OR OF ANY CLAIM BASED THEREON. IF FOR ANY REASON SUCH DESIGNEE, APPOINTEE AND AGENT SHALL CEASE TO BE AVAILABLE TO ACT AS SUCH, THE COMPANY AGREES TO DESIGNATE A NEW DESIGNEE, APPOINTEE AND AGENT IN NEW YORK CITY REASONABLY SATISFACTORY TO THE REQUIRED HOLDERS ON THE TERMS AND FOR THE PURPOSES OF THIS PROVISION. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF A NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.

(d)     EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; (iii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OF COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iv) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE NOTE DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 25.8.

56

**[Signature Pages Follow]**

57

As to each Purchaser, if such Purchaser is in agreement with the foregoing, such Purchaser will sign the form of agreement on the accompanying counterpart of this Agreement and return it to the Company, whereupon the foregoing shall become a binding agreement between such Purchaser and the Company.

Very truly yours,

**PENTA WATER COMPANY, INC.**
(formerly known as Bio-Hydration Research Lab, Inc.)

By_____

Dennis O'Brien
Chief Executive Officer

The foregoing is hereby
agreed to as of the
date thereof:

**PLAINFIELD DIRECT WEST II LLC, in its capacities as
the Administrative Agent and as the Purchaser**

By: _____
Name:  Thomas X. Fritsch
Title:  Authorized Individual

SCHEDULE A

## INFORMATION RELATING TO PURCHASERS

| Name and Address of Purchaser | Maximum Credit Amount |
|---|---|

PLAINFIELD DIRECT WEST II LLC    $6,000,00.00

(1) All payments by wire transfer of immediately available funds to such accounts as may be identified in writing by the foregoing Purchaser to the Company. Each payment made by wire transfer shall contain sufficient information to identify the source and application of such funds.

(2) All communications (including all notices of payments and written confirmations of such wire transfers):

Plainfield Direct West II LLC
c/o Plainfield Asset Management LLC
55 Railroad Avenue
Greenwich, CT 06830
Attention: Thomas X. Fritsch
Fax: (203) 302-1779

SCHEDULE B

## DEFINED TERMS

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term:

"*Administrative Agent*" is defined in the initial paragraph of the Agreement.

"*Adjusted Consolidated EBITDA*" means for any applicable period of computation, (a) Consolidated Net Income for such period *plus* (b) the sum of the following to the extent deducted in calculating Consolidated Net Income:  (i) Consolidated Interest Expense for such period, (ii) the provision for Federal, state, local and foreign income taxes payable by the Company and its Subsidiaries for such period, (iii) depreciation, depletion and amortization expense for such period, (iv) all non-cash compensation charges related to Statement of Financial Account Standards No. 123R for such period, and (v) other non recurring expenses of the Company and its Subsidiaries reducing such Consolidated Net Income which do not represent a cash item in such period or any future period *minus* (c) the following to the extent included in calculating such Consolidated Net Income: (i) Federal, state, local and foreign income tax credits of the Company and its Subsidiaries for such period and (ii) all non cash items increasing Consolidated Net Income for such period.

"*Advance*" is defined in Section 2.

"*Affiliate*" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"*Agreement*" means this Note Purchase Agreement executed by and among the Company and each Purchaser, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"*Anti-Terrorism Order*" means Executive Order No. 13,224 of September 24, 2001, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, 66 U.S. Fed. Reg. 49, 079 (2001), as amended.

"*Availability Period*" means, as to each Purchaser the period from and including the Effective Date for such Purchaser to but excluding the Availability Termination Date.

"*Availability Termination Date*" means the earlier of (a) the date that is forty-five calendar days prior to the Final Maturity Date, or (b) the date on which the Commitments are otherwise terminated pursuant to the provisions hereof.

"*Bankruptcy Code*" means title 11 of the United States Code, as in effect from time to time.

"*Board*" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

Page 1<br>Schedule B

"**Budget**" means the annual operating budget (including budgeted statements on both a monthly and full year basis of income and sources and uses of cash, retained earnings and balance sheets) for the Company and its Subsidiaries as referred to in Sections 5.6 and 10.1(l) hereof.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banks in New York, New York are required or authorized to be closed.

"**Capital Expenditures**" shall mean, as to any Person, the expenditures of such Person that, in accordance with GAAP, are or should be included in "additions to property, plant and equipment" or similar items (including, without limitation Capital Lease Obligations) reflected in the statement of cash flows of such Person.

"**Capital Leases**" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder.

"**Casualty Event**" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of any Obligor or any Subsidiary having a fair market value in excess of $300,000.

"**CERCLA**" has the meaning assigned such term in the definition of "Environmental Laws".

"**Change of Control**" means any situation or circumstance in which the Existing Shareholders (as such term is hereinafter defined) for any reason fail directly, beneficially, and of record to own, on a fully diluted basis, at least 50% of the Equity Interests of the Company (not including, for this purpose, any Equity Interests owned directly or indirectly by any Purchaser and its Affiliates). As used herein, the term "**Existing Shareholders**" means the shareholders that, as of the Closing Date, own Equity Interests in the Company.

"**Closing**" is defined in Section 4.

"**Closing Date**" is defined in Section 4.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"**Commitment**" means, with respect to each Purchaser, the commitment of such Purchaser to make Advances as such commitment may be modified from time to time pursuant to assignments by or to such Purchaser pursuant to Section 25.1. The amount representing each Purchaser's Commitment shall at any time be such Purchaser's Maximum Credit Amount.

"**Commitment Fees**" is defined in Section 7.7(b).

"**Company**" is defined in the initial paragraph of the Agreement.

Page 2
Schedule B

"*Consolidated*" shall mean, when used with reference to financial statements or financial statement items of the Company and its Subsidiaries or any other Person, such statements or items on a consolidated basis in accordance with the consolidation principles of GAAP.

"*Consolidated Capital Expenditures*" shall mean, for any applicable period of computation, all Capital Expenditures of the Company and its Subsidiaries on a Consolidated basis for such period.

"*Consolidated Funded Debt*" shall mean, on any date of calculation, Funded Debt of the Company and its Subsidiaries on a Consolidated basis.

"*Consolidated Interest Expense*" shall mean, for any applicable period of computation, all interest expense (excluding amortization of debt discount and premium, but including the interest component under Capital Leases) for such period of the Company and its Subsidiaries on a Consolidated basis.

"*Consolidated Net Income*" shall mean, for any applicable period of computation, the net income (excluding non-cash income in excess of $200,000 and extraordinary losses and gains) as determined in accordance with GAAP of the Company and its Subsidiaries on a Consolidated basis for such period.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly 33% or more of the Equity Interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such other Person) will be deemed to "control" such other Person. "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Debt*" means, for any Person, the sum of the following (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services; (d) all obligations under Capital Leases; (e) all obligations under Synthetic Leases; (f) all Debt (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Debt is assumed by such Person; (g) all Debt (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Debt (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Debt and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of others or to purchase the Debt or Property of others; (i) obligations to deliver commodities, goods or services in consideration of one or more advance payments; (j) obligations to pay for goods or services even if such goods or services are not actually received or utilized by such Person; (k) any Debt of a partnership for which such

Page 3
Schedule B

78

Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; (l) Disqualified Capital Stock; and (m) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment. The Debt of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP.

"*Default*" means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, becomes an Event of Default.

"*Default Rate*" is defined in Section 7.8.

"*Disposal*" has the meaning assigned such term in the definition of "Environmental Laws".

"*Disposed*" has the meaning assigned such term in the definition of "Environmental Laws".

"*Disqualified Capital Stock*" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Debt or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the earlier of (a) the Final Maturity Date and (b) the date on which there are no obligations outstanding hereunder.

"*dollars*" or "*$*" refers to the lawful currency of the United States of America.

"*Effective Date*" means, as to each Purchaser, the date specified on the signature page for such Purchaser.

"*Environmental Laws*" means any and all Governmental Requirements pertaining in any way to health, safety the environment or the preservation or reclamation of natural resources, in effect in any and all jurisdictions in which any Obligor or any Subsidiary is conducting or at any time has conducted business, or where any Property of any Obligor or any Subsidiary is located, including without limitation, the Oil Pollution Act of 1990 ("*OPA*"), as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("*CERCLA*"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976 ("*RCRA*"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other environmental conservation or protection Governmental Requirements. The term "*Oil*" shall have the meaning specified in OPA, the terms "*Hazardous Substance*" and "*Release*" (or

"*Threatened Release*") have the meanings specified in CERCLA, the terms "*Solid Waste*" and "*Disposal*" (or "*Disposed*") have the meanings specified in RCRA and the term "*Oil and Gas Waste*" shall have the meaning specified in Section 91.1011 of the Texas Natural Resources Code ("*Section 91.1011*"); provided, however, that (a) in the event either OPA, CERCLA, RCRA or Section 91.1011 is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment and (b) to the extent the laws of the state or other jurisdiction in which any Property of any Obligor or any Subsidiary is located establish a meaning for "*Oil*," "*Hazardous Substance*," "*Release*," "*Solid Waste*," "*Disposal*" or "*Oil and Gas Waste*" which is broader than that specified in either OPA, CERCLA, RCRA or Section 91.1011, such broader meaning shall apply.

"*Equity Interests*" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"*ERISA Affiliate*" means each trade or business (whether or not incorporated) which together with an Obligor or a Subsidiary would be deemed to be a "single employer" within the meaning of section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of section 414 of the Code.

"*ERISA Event*" means (a) a "Reportable Event" described in section 4043 of ERISA and the regulations issued thereunder, (b) the withdrawal of an Obligor, a Subsidiary or any ERISA Affiliate from a Plan during a plan year in which it was a "substantial employer" as defined in section 4001(a)(2) of ERISA, (c) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under section 4041 of ERISA, (d) the institution of proceedings to terminate a Plan by the PBGC, (e) receipt of a notice of withdrawal liability pursuant to Section 4202 of ERISA or (f) any other event or condition which constitutes grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"*Event of Default*" is defined in Section 12.

"*Excepted Liens*" means: (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (c) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in

accordance with GAAP; (d) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by any Obligor or any Subsidiary to provide collateral to the depository institution; (e) easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the any Obligor or any Subsidiary for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure any monetary obligations and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by any Obligor or any Subsidiary or materially impair the value of such Property subject thereto; (f) Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business and (g) judgment and attachment Liens not giving rise to an Event of Default, provided that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; provided, further that Liens described in clauses (a) through (d) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced.

   "*Excluded Taxes*" means, with respect to any Holder or any other recipient of any payment to be made by or on account of any obligation of any Obligor hereunder or under any other Note Document, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America or such other jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Holder, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which any Obligor is located and (c) in the case of a Foreign Holder (other than an assignee pursuant to a request by the Company under Section 17.2(b)), any withholding tax that is imposed on amounts payable to such Foreign Holder at the time such Foreign Holder becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Holder's failure to comply with Section 17.2(e), except to the extent that such Foreign Holder (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding tax pursuant to Section 17.2(a) or Section 17.2(c).

   "*Final Maturity Date*" means the earlier of (a) June 28, 2012, or (b) the date on which the full outstanding principal balance of the Notes (together with all accrued unpaid interest with respect thereto and all other amounts owed under the Note Documents other than indemnities and other similar contingent obligations that are not yet due and payable pursuant to the terms of this Agreement) becomes due and payable, regardless of how such maturity may be brought about.

"*Financial Officer*" means, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person. Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Company.

"*Foreign Holder*" means any Holder that is organized under the laws of a jurisdiction other than that in which the Company is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1(b).

"*Governmental Authority*" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government over any Obligor, any Subsidiary, any of their Properties, or any Purchaser.

"*Governmental Requirement*" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement, whether now or hereinafter in effect, including, without limitation, Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"*Guarantied Obligations*" means the collective reference to the payment and performance of all Indebtedness and all obligations of the Obligors and the Subsidiaries under the Note Documents, including, without limitation, the unpaid principal of and interest on the Notes and all other obligations and liabilities of the Obligors and the Subsidiaries (including, without limitation, interest accruing at the then applicable rate provided in this Agreement after the maturity of the Notes and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Obligor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) to the Holders, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, the Notes Documents, whether on account of principal, interest, reimbursement obligations, payments in respect of an early termination date, fees, indemnities, costs, expenses or otherwise (including, without limitation, all reasonable fees and disbursements of counsel to the Holders that are required to be paid by the Obligors pursuant to the terms of any Note Documents).

"*Guaranty Obligations*" shall mean, with respect to any Person, without duplication, any obligations of such Person (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guaranteeing or intended to guarantee any Debt of any other Person in any manner, whether direct or indirect, and including without limitation any obligation, whether or not contingent, (i) to purchase any such Debt or any property constituting security therefor, (ii) to advance or provide funds or other support for the payment or purchase of any such Debt or to maintain working capital, solvency or other balance sheet

condition of such other Person (including without limitation keep well agreements, maintenance agreements, comfort letters or similar agreements or arrangements) for the benefit of any holder of Debt of such other Person, (iii) to lease or purchase Property, securities or services primarily for the purpose of assuring the holder of such Debt, or (iv) to otherwise assure or hold harmless the holder of such Debt against loss in respect thereof. The amount of any Guaranty Obligation hereunder shall (subject to any limitations set forth therein) be deemed to be an amount equal to the outstanding principal amount (or maximum principal amount, if larger) of the Debt in respect of which such Guaranty Obligation is made.

"*Guarantors*" means each Subsidiary that guarantees the Indebtedness pursuant to Section 14. As of the Closing Date, there are no Guarantors.

"*Hazardous Substance*" has the meaning assigned such term in the definition of "Environmental Laws".

"*Highest Lawful Rate*" means, with respect to each Holder, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Notes or on other Indebtedness under laws applicable to such Holder which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"*Holder*" means, with respect to any Note, the Person in whose name such Note is registered in the register maintained by the Company pursuant to Section 15.1.

"*Indebtedness*" means any and all amounts owing or to be owing by any Obligor, any Subsidiary or any Guarantor (whether direct or indirect, including those acquired by assumption, absolute or contingent, due or to become due, now existing or hereafter arising) to any Holder under any Note Document and all renewals, extensions and/or rearrangements thereof.

"*Indemnified Taxes*" means Taxes other than Excluded Taxes.

"*Indemnitee*" is defined in Section 17.1(b).

"*INHAM Exemption*" is defined in Section 9.2(e).

"*Institutional Investor*" means (a) any Purchaser of a Note, (b) any Holder of a Note holding (together with one or more of its affiliates) more than 10% of the aggregate principal amount of the Notes then outstanding, (c) any bank, trust company, savings and loan association or other financial institution, any pension plan, any investment company, any insurance company, any broker or dealer, or any other similar financial institution or entity, regardless of legal form, and (d) any Related Fund of any Holder of any Note.

"*Investment*" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person or any agreement to make any such acquisition (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short

sale); (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Debt of, purchase or other acquisition of any other Debt or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business); (c) the purchase or acquisition (in one or a series of transactions) of Property of another Person that constitutes a business unit or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to be sold) with respect to, Debt or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"*Knowledge*" or "*aware*" means, in respect of the Obligors, (a) the actual knowledge or awareness of a Responsible Officer, and (b) the knowledge a Responsible Officer could be expected to attain in the course of conducting a reasonable investigation.

"*Leverage Ratio*" shall mean, for any date of determination, the ratio of (a) Consolidated Debt as of such date to (b) Adjusted Consolidated EBITDA for the twelve-month period ending as of such date.

"*License Agreement*" means that certain Amended and Restated License and Manufacturing Agreement dated as of May 28, 2003, executed by and between AquaPhotonics, Inc. and the Company, as the same has been or may hereafter be amended, supplemented, restated or otherwise modified from time to time.

"*Lien*" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes. The term "*Lien*" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations. For the purposes of this Agreement, the Obligors and the Subsidiaries shall be deemed to be the owner of any Property which they have acquired or hold subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"*Material Adverse Effect*" means a material adverse change in, or material adverse effect on (a) the business, operations, Property, liabilities (actual or contingent), condition (financial or otherwise) or prospects of the Obligors and the Subsidiaries taken as a whole, (b) the ability of any Obligor, any of Subsidiary, or any Guarantor to perform any of its obligations under any Note Document to which it is a party, (c) the validity or enforceability of any Note Document or (d) the rights and remedies of or benefits available to any Purchaser under any Note Document.

"*Material Contracts*" means those contracts listed on Schedule 8.21 hereto, as the same may be amended, supplemented, restated, replaced or otherwise modified from time to time.

"*Material Indebtedness*" means Debt (other than the Indebtedness), or obligations in respect of one or more Swap Agreements, of any one or more of the Obligors and the Subsidiaries in an aggregate principal amount exceeding $300,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of any Obligor or any Subsidiary in respect of any Swap Agreement at any time shall be the Swap Termination Value.

"*Maximum Credit Amount*" means, as to each Purchaser, the amount set forth opposite such Purchaser's name on Schedule A under the caption "Maximum Credit Amount" as the same may be modified from time to time pursuant to any assignment permitted by Section 25.1.

"*Moody's*" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"*Multiemployer Plan*" means a Plan which is a multiemployer plan as defined in section 3(37) or 4001 (a)(3) of ERISA.

"*NAIC*" means the National Association of Insurance Commissioners or any successor thereto.

"*NAIC Annual Statement*" is defined in Section 9.2(a).

"*Note Documents*" means (a) this Agreement, (b) the Notes, and (c) any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by any Obligor or any other Person (other than participation or similar agreements between any Purchaser and any other lender or creditor with respect to any Indebtedness pursuant to this Agreement) in connection with, or as security for the payment or performance of the Indebtedness, the Notes, or this Agreement, in each case as such agreements may be amended, modified, supplemented or restated from time to time.

"*Notes*" is defined in Section 2.

"*Obligors*" means the Company and each Subsidiary that becomes a Guarantor pursuant to the provisions of Section 14. As of the Closing Date, the Company is the only Obligor under this Agreement.

"*Obligor Claims*" means all debts and obligations of the any Obligor to any other Obligor, whether such debts and obligations now exist or are hereafter incurred or arise, or whether the obligation of the debtor thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or obligations be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or obligations may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by.

"*Oil*" has the meaning assigned such term in the definition of "Environmental Laws".

"*Oil and Gas Waste*" has the meaning assigned such term in the definition of "Environmental Laws".

"*OPA*" has the meaning assigned such term in the definition of "Environmental Laws".

"*Organizational Documents*" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"*Other Taxes*" means any and all present or future stamp or documentary taxes or any other excise or Property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement and any other Note Document.

"*Payment Date*" means the last Business Day of each calendar quarter, commencing with September 28, 2007.

"*PBGC*" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"*Permitted Indebtedness*" is defined in Section 11.1.

"*Permitted Liens*" is defined in Section 11.2.

"*Permitted IP Liens*" means:  (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; and (b) judgment and attachment Liens not giving rise to an Event of Default, provided that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; provided, further that Liens described in clauses (a) and (b) shall remain "Permitted IP Liens" only for so long as no action to enforce such Lien has been commenced.

"*Permitted Refinancing Debt*" means Debt (for purposes of this definition, "*new Debt*") incurred in exchange for, or proceeds of which are used to refinance, all of any other Debt (the "*Refinanced Debt*"); provided that (a) such new Debt is in an aggregate principal amount not in excess of the sum of (i) the aggregate principal amount then outstanding of the Refinanced Debt (or, if the Refinanced Debt is exchanged or acquired for an amount less than the principal amount thereof to be due and payable upon a declaration of acceleration thereof, such lesser amount) and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such exchange or refinancing; (b) such new Debt has a stated maturity no earlier than the stated maturity of the Refinanced Debt and an average life no shorter than the average life of the Refinanced Debt; (c) such new Debt does not have a stated interest rate in excess of the stated

interest rate of the Refinanced Debt; (d) such new Debt does not contain any covenants which require material additional reporting obligations by, or impose material additional restrictions on, or impose material accelerated payment obligations on, the Obligors as compared to those imposed by the Refinanced Debt, and (e) such new Debt (and any guarantees thereof) is subordinated in right of payment to the Indebtedness if and to the same extent as the Refinanced Debt was subordinated in right of payment to the Indebtedness.

"***Person***" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"***PIK Fees***" is defined in Section 7.7(b).

"***PIK Interest***" is defined in Section 7.6(a).

"***Plan***" means any employee pension benefit plan, as defined in section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by an Obligor, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by an Obligor, or a Subsidiary or an ERISA Affiliate.

"***Property***" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"***PTE***" is defined in Section 9.2(a).

"***Purchaser***" and "***Purchasers***" are defined in the initial paragraph of the Agreement.

"***QPAM Exemption***" is defined in Section 9.2(d).

"***RCRA***" has the meaning assigned such term in the definition of "Environmental Laws".

"***Redemption***" means with respect to any Debt, the repurchase, redemption, prepayment, repayment, or defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Debt. "***Redeem***" has the correlative meaning thereto.

"***Refinanced Debt***" has the meaning assigned such term in the definition of "Permitted Refinancing Debt".

"***Related Fund***" means, with respect to any Holder of any Note, any fund or entity that (i) invests in Securities or bank loans, and (ii) is advised or managed by such Holder, the same investment advisor as such Holder or by an affiliate of such Holder or such investment advisor.

"***Related Parties***" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"*Release*" has the meaning assigned such term in the definition of "Environmental Laws".

"*Required Holders*" means, at any time, the Holders of at least 50% in principal amount of the Notes at the time outstanding (exclusive of Notes then owned by the Obligors or any of their respective Affiliates).

"*Responsible Officer*" means as to any Person, the Chief Executive Officer, the President, any Financial Officer or any Vice President of such Person. Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the Company.

"*Restricted Payment*" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in any Obligor, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in any Obligor or any option, warrant or other right to acquire any such Equity Interests in any Obligor.

"*S&P*" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"*SEC*" means the United States Securities and Exchange Commission and any successor thereto.

"*Section 91.1011*" has the meaning assigned such term in the definition of "Environmental Laws".

"*Securities Act*" means the Securities Act of 1933, as amended from time to time.

"*Solid Waste*" has the meaning assigned such term in the definition of "Environmental Laws".

"*Source*" is defined in Section 9.2.

"*Subsequent Advances*" is defined in Section 2.

"*Subsidiary*" means (a) any Person of which at least a majority of the outstanding Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors, manager or other governing body of such Person (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by any Obligor or one or more of the Subsidiaries of the Obligors, or by one or more Obligors, or by any Obligor and one or more of the Subsidiaries of any Obligor, and (b) any partnership of which any Obligor or any of the Subsidiaries is a general partner. Unless otherwise indicated herein, each reference to the term "Subsidiary" shall mean a Subsidiary of one or more Obligors.

Page 13
Schedule B

"*SVO*" means the Securities Valuation Office of the NAIC or any successor to such Office.

"*Swap Agreement*" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Obligors or the Subsidiaries shall be a Swap Agreement.

"*Swap Termination Value*" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"*Synthetic Leases*" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"*Taxes*" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"*Threatened Release*" has the meaning assigned such term in the definition of "Environmental Laws".

"*Transaction Fees*" means those fees that are payable by the Company pursuant to the provisions of Section 7.7.

"*Transactions*" means, with respect to any Obligor, the execution, delivery and performance by such Obligor of this Agreement and each other Note Document to which it is a party, the sale of the Notes, and the use of the proceeds thereof.

"*USA Patriot Act*" means United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

Page 14<br/>Schedule B

"*Wholly-Owned Subsidiary*" means (a) any Subsidiary of which all of the outstanding Equity Interests (other than any directors' qualifying shares mandated by applicable law), on a fully-diluted basis, are owned by an Obligor or one or more of the Wholly-Owned Subsidiaries or are owned by one or more Obligors or are owned by an Obligor and one or more of the Wholly-Owned Subsidiaries or (b) any Subsidiary that is organized in a foreign jurisdiction and is required by the applicable laws and regulations of such foreign jurisdiction to be partially owned by the government of such foreign jurisdiction or individual or corporate citizens of such foreign jurisdiction, provided that an Obligor, directly or indirectly, owns the remaining Equity Interests in such Subsidiary and, by contract or otherwise, controls the management and business of such Subsidiary and derives economic benefits of ownership of such Subsidiary to substantially the same extent as if such Subsidiary were a Wholly-Owned Subsidiary. Unless otherwise indicated herein, each reference to the term "Wholly-Owned Subsidiary" shall mean a Wholly-Owned Subsidiary of one or more Obligors.

Schedules to
Note Purchase Agreement of
Penta Water Company, Inc.
(formerly known as
Bio-Hydration Research Lab, Inc.)

### Exceptions to Representations and Warranties of Obligors

**Schedule 8.4 – Financial condition, etc.**

- (a)The Company has not received the audited financial statements for the year ending December 31, 2006 from its auditors.

- (b) The Company is a defendant in litigation filed against it by Summit Financial Services in March 2007 in San Diego District Court which is seeking $286,531 in payments allegedly owed to Summit. The plaintiff is an assignee of Big Dog Enterprises Logistics, LLC (dba Freight Hauling Logistics) and claims that the Company made payments to Federal Express and credited such payments against the account of Freight Hauling Logistics that should have been paid directly to Summit Financial Services. After the assignment, Summit had not paid Federal Express payments due to FedEx on the Compan's behalf. The Company, after advising Freight Hauling Logistics of its intent, made payments directly to Federal Express and credited such amounts against payments owed to Summit. The Company currently reflects approximately $72,000 on its books as the total amount actually due to Summit Financial Services / Freight Hauling Logistics. Litigation is in the early stages of discovery.

- (c) See Summit litigation described in 8.4(b). The Company owes NBC approximately $198,000 for promotional services on the NBC television show "The Biggest Loser", which amount the Company is disputing since the promised promotion and exposure was not what was represented by NBC. The Company has provided for a contingency amount for this liability in its current financial statements.

**Schedule 8.5 – Litigation.** See the Summit litigation described in Schedule 8.4(b) above)

**Schedule 8.6 --Environmental Matters.** None

**Schedule 8.9 - Taxes.** The Company has not filed its Federal and State corporate income tax returns for the year ended December 31, 2006. All of these returns are on extension, and will be filed prior to due date of the extension.

**Schedule 8.13 – Equity Interests.**
**Stock Outstanding**

    Common Stock                    23,257,445

| Preferred Series A | 2,007,998 |
| Preferred Series B | 1,405,059 |
| Preferred Series C-1 | 5,247,601 |
| Preferred Series C-2 | 2,000 |
| **Total Outstanding** | 31,920,103 |

**Warrants Outstanding**

| Common Stock | 1,359,449 |
| Preferred Series A | 70,000 |
| Preferred Series C-1 | 16,666,667 |

**Stock Rights Outstanding**

| Stock Options | 6,699,310 |
| Restricted Stock Purchase Rights | 562,500 |

**Schedule 8.15- Title, etc.** (d) – The Company has a lease for a piece of equipment called a "Turboscan"  The equipment has a net value of approximately $39,000, and is not necessary for the operation of the business. Shortly after the Closing, the Company intends to sell this asset to Aquaphotonics, Inc. at the net book value of this asset.

**Schedule 8.21 – Material Contracts**

1. Equipment Lease – Balboa Capital (Turboscan) dated August 19, 2005
2. Equipment Lease – Sentry Financial (Bottling Equipment) dated November 1, 2002
3. Equipment Lease – Toyota Motor Credit (Forklifts) at various dates
4. Equipment Lease – Wells Fargo Bank (Copiers and Fax) dated January 2, 2004
5. Equipment Lease – Irwin Business Financial Services (Label Equipment) dated July 12, 2005
6. Equipment Lease – Dell Computer (Computers) dated October 3, 2006
7. Ricoh American Corporation (Copy machine) dated March 28, 2007
8. Vehicle Lease – CIT Corporation (Ford Van) under Master Lease dated June 30, 2005
9. Action by Written consent of the Shareholders of BHRL – Amendment of Article of Incorporation
10. Settlement & Release Agreement – G.R. Holloway, William D. Holloway and David Cheatham
11. Sales Representation Agreement – Natural Specialty Sales  (Health Food, Groceries & Drug stores in US, Alaska, & Hawaii) dated January 9, 2004
12. Assignment of Trademark – Aquaphotonics, Inc. dated November 1, 2006
13. Consultant Agreement – Lee Hieb (Finance) dated December 4, 2006
14. Consultant Agreement – David Donaldson (Sales & Marketing) dated May 3, 2007
15. Consultant Agreement – Steven Carter (Deduction Management) dated June 11, 2007
16. Employment Agreement – Dennis O'Brien dated March 30, 2007
17. Professional Services Agreement – Dayakar Ravikotimatam (Oracle Support)
18. International Distributor Agreement – Pacific Innovation (Japan) dated March 1, 2006
19. International Broker Agreement  - Norm Hacker (Australia) dated November 1, 2006.
20. Agency Client Agreement – Townsend (Public Relations) dated March 1, 2007
21. Letter agreement with NBC (related to Product Placement) dated August 2006 (Currently in dispute - $198,000 still due under contract, amount is reflected as a liability on financial statements.)

22. Amended & Restated License & Manufacturing Agreement - Aquaphotonics, Inc. dated December 26, 2006
23. Supply Agreement – West Coast Container Inc. (bottle) dated September 29, 2006
24. Pricing Agreement – Federal Express dated July 13, 2006
25. Series C-1 and Series C-2 Preferred Stock and Warrant Purchase Agreement dated December 28, 2006.
26. Amended and Restated Investors Rights Agreement (Penta Water Company and Penta 1836 LLC) dated December 28, 2006
27. Right of First Refusal and Co-Sale Agreement (Penta Water Company and Penta 1836 LLC) dated December 28, 2006
28. Voting Agreement (Penta Water Company / Founders / Penta 1836 LLC) dated December 28, 2006
29. Security Agreement (API and Penta Water Company) dated December 28, 2006
30. Exclusive Placement Agent letter – Engagement of Granite Financial dated December 27, 2006.
31. Confidential Settlement Agreement & Mutual General Release – Nancy Ridge Technology Center (Landlord) dated August 23, 2005.
32. Sales & Marketing Contract – Touch Agency
33. First Amendment to Amend & Restated Lease – 2091 Rutherford Road, Carlsbad, CA dated March 7, 2005
34. Second amendment to Sublease Agreement - Callaway Golf dated December 1, 2006
35. Sublease Agreement – La Jolla Lighting dated January 24, 2007
36. Loan Extension Agreement & Modification of Note – Cathay Bank dated April 24, 2007


## Schedule 11.1 - Existing Debt of Obligors.

The Company owes NBC approximately $198,000 for promotional services on the NBC television show "The Biggest Loser", which amount the Company is disputing since the promised promotion and exposure was not what was represented by NBC.

On March 27, 2006, the Company entered into a revolving line of credit agreement with Cathay Bank for advances of up to $2,000,000 with a maturity date of April 1, 2007. The advances were subject to a monthly borrowing base of 80% of the aggregate amount of eligible accounts receivable (as defined) and 45% of the eligible Finished Goods Inventory located in California. The agreement requires monthly interest payments at prime plus 2.0% (10.25% at May 31, 2007) and contains certain restrictive covenants. In addition, the agreement provided for 150,000 common stock warrants to be issued at an exercise price of $0.50 per share maturing in 2013. On April 24, 2007, the Company renewed the Cathay Bank loan at a reduced borrowing line of $1,250,000. As of May 31, 2007, the Company owes $1,000 against this line. The Company intends to retire this debt as part of the proceeds from the Note Purchase Agreement with Plainfield

## Capital Leases:

| Holder of Capital Lease | Description of Equipment |
| --- | --- |
| Toyota Financial Services | Toyotalift (Forklift Model 5FBCU15) |
| | Toyotalift (Forklift Model 7FBCU25) |
| | Toyotalift (Forklift Model 5FBCU15) |
| Sentry Financial Services | Bottling Line |
| Wells Fargo Bank | Cannon Copier |
| | Savin Copier |
| | Ricoh Fax |

CIT Financial Services                    2004 Ford Van
Balboa Capital                            Turbiscan TLAB Analytical Equipment
Irwin Business Finance Corp.      Nordson Pro Blue 7 Melter
Dell Computer Corporation                  Hardware and Software Backup System
Ricoh American Corporation        Ricoh Color Copier

**Schedule 11.2 – Existing Liens.**

**Lien Holder**                               **Description of Asset**

Toyota Financial Services                  Toyotalift (Forklift Model 5FBCU15)
                                           Toyotalift (Forklift Model 7FBCU25)
                                           Toyotalift (Forklift  Model 5FBCU15)
Sentry Financial Services                  Bottling Line
Wells Fargo Bank                           Cannon Copier
                                           Savin Copier
                                           Ricoh Fax
CIT Financial Services                     2004 Ford Van
Balboa Capital                             Turbiscan TLAB Analytical Equipment
Irwin Business Finance Corp.      Nordson Pro Blue 7 Melter
Dell Computer Corporation                  Hardware and Software Backup System
Ricoh American Corporation        Ricoh Color Copier
Cathay Bank                       Substantially all of the Company's assets


**Schedule 11.19 – Transactions with Affiliates.  None.**

## EXHIBIT 1 TO NOTE PURCHASE AGREEMENT

## FORM OF 10% SENIOR UNSECURED NOTE

### PENTA WATER COMPANY, INC.
(formerly know as Bio-Hydration Research Lab, Inc.)

#### 10% SENIOR UNSECURED NOTE

No. [___]

[_____], 2007

$[_____]

FOR VALUE RECEIVED, the undersigned, PENTA WATER COMPANY, INC. (formerly known as Bio-Hydration Research Lab, Inc.), a California corporation (herein called the "*Company*"), hereby promises to pay to [INSERT NAME OF HOLDER], a [insert type of entity and jurisdiction of organization, such as "a Delaware corporation"], or registered assigns (the "*Payee*"), the principal sum of [INSERT AMOUNT IN WORDS] (US$[_____]), which amount is referred to herein as the "*Maximum Note Amount*", or such lesser amount as shall equal the aggregate unpaid principal amount of Advances made by the Payee to the Company from time to time pursuant to the Note Purchase Agreement (as hereinafter defined), together with any PIK Amounts (as defined below) that may be added from time to time to the principal balance of this Note in accordance with the provisions of Section 7.6(a) or Section 7.7(b) of the Note Purchase Agreement referred to below.

The Company shall pay the above-referenced principal amounts to the Payee in lawful money of the United States of America and in immediately available funds, on the dates and in the amounts specified in the Note Purchase Agreement referred to below, at a bank account of Payee as specified in writing by Payee to the Company, or at such other address or account in the State of New York as Payee may designate from time to time in writing to the Company. The bank account of Payee to which such payments shall be made from time to time is herein referred to as the "*Payee's Bank Account*".

The Company further agrees to pay interest on the amounts advanced by Payee hereunder (collectively, the "*Advances*") and any other principal amounts outstanding hereunder (including any PIK Amounts that are added to the outstanding principal balance of this Note), at the Payee's Bank Account, in like money and funds, for the period commencing on the date of such Advance (or, the case of any PIK Amounts, commencing on the date on which such PIK Amounts are deemed to be added to the principal balance of this Note in accordance with the provisions of Section 7.6(a) or Section 7.7(b) of the Note Purchase Agreement) until all such outstanding principal amounts shall be paid in full, at the rates (including, without limitation, to the extent applicable, the Default Rate) and payable on the dates set forth in that certain Note Purchase Agreement dated as of June 28, 2007 (as the same may be amended, supplemented, restated, renewed or otherwise modified from time to time, the "*Note Purchase Agreement*"), entered into by and between the Company and [insert name of Plainfield entity], in it capacity as the Administrative Agent and in its capacity as the Purchaser. Unless otherwise indicated,

capitalized terms used in this Note shall have the respective meanings ascribed to such terms in the Note Purchase Agreement.

This Note shall be funded in up to four Advances, provided that (a) the aggregate principal amount outstanding under this Note (excluding, for this purpose, any PIK Amounts added from time to time to the principal balance of this Note) may in no event exceed the Maximum Note Amount, and (b) the ability of the Company to obtain each Advance shall be subject in all respects to the satisfaction, at or prior to the making of such Advance, of each of the applicable conditions set forth in the Note Purchase Agreement (including, without limitation, the conditions set forth in Sections 5 and 6 of the Note Purchase Agreement), unless such condition has been waived by the Payee in writing. The amount and date of all Advances made under this Note shall be recorded by the Payee on its books for this Note and, prior to transfer, may be endorsed by the Payee on a schedule attached to this Note or any continuation thereof or on any separate record maintained by the Payee. Failure to make such notation or to attach such a schedule shall not affect the Payee's or the Company's rights or obligations in respect of any extensions of credit made hereunder or affect the validity of such transfer by the Payee of this Note.

Under the circumstances set forth in Section 7.6(a) of the Note Purchase Agreement, PIK Interest (herein referred to as "*PIK Interest*") may automatically be added to the outstanding principal balance of this Note and shall thereafter, for all purposes, be deemed to be a part of the principal amount of this Note. In addition, under the circumstances set forth in Section 7.7(b) of the Note Purchase Agreement, PIK Fees (herein referred to as "*PIK Fees*", and, together with PIK Interest, the "*PIK Amounts*") may automatically be added to the outstanding principal balance of this Note and shall thereafter, for all purposes, be deemed to be a part of the principal amount of this Note.

This Note has been issued pursuant to the Note Purchase Agreement and is entitled to the benefits thereof and to the benefits of the other Note Documents. Each holder of this Note will be deemed, by its acceptance hereof, to have (a) agreed to the confidentiality provisions set forth in Section 21 of the Note Purchase Agreement and (b) made the representations set forth in Sections 9.1 and 9.2 of the Note Purchase Agreement.

This Note is a registered Note and, as provided in the Note Purchase Agreement, upon surrender of this Note for registration of transfer, duly endorsed, or accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note for a like principal amount will be issued to, and registered in the name of, the transferee. Prior to due presentment for registration of transfer, the Company may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Company will not be affected by any notice to the contrary.

If an Event of Default occurs and is continuing, the principal of this Note may be declared or otherwise become due and payable in the manner, at the price and with the effect provided in the Note Purchase Agreement.

2

[Signature Page Follows]

3

97

This Note shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York.

PENTA WATER COMPANY, INC.
(formerly known as Bio-Hydration Research Lab, Inc.)

By:_____

Name:

Title:

4

**EXHIBIT 5.5 TO NOTE PURCHASE AGREEMENT**

**LIST OF OPINIONS OF COUNSEL**

1.    Opinion of Procopio, Cory, Hargreaves & Savitch LLP.

## EXHIBIT 5.9 TO NOTE PURCHASE AGREEMENT

## FORM OF COMPLIANCE CERTIFICATE

The undersigned hereby executes this Compliance Certificate as of _____, 200\_\_, and hereby certifies that he or she is an officer or other authorized representative of Penta Water Company, Inc. (formerly known as Bio-Hydration Research Lab, Inc.), a California corporation (the "*Company*"), and that as such he or she is authorized to execute this Certificate on behalf of the Company. With reference to that certain Note Purchase Agreement dated as of June 28, 2007 (together with all amendments, restatements, supplements or other modifications thereto, the "*Note Purchase Agreement*"), among the Company, the Administrative Agent named therein and the Purchasers named therein, the undersigned represents and warrants as follows (each capitalized term used herein having the same meaning given to it in the Note Purchase Agreement unless otherwise specified):

(a)     The Company has performed and complied with all covenants, agreements and conditions contained in the Note Purchase Agreement and in the Note Documents required to be performed or complied with by it prior to or at the time of delivery hereof.

(b)     Since December 31, 2006, no change has occurred, either in any case or in the aggregate, in the condition, financial or otherwise, of the Company or any Subsidiary thereof which could reasonably be expected to have a Material Adverse Effect.

(c)     There exists no Default or Event of Default.

**[Signature Page Follows]**

EXECUTED AND DELIVERED the date first above written.

> **PENTA WATER COMPANY INC.**
> (formerly known as Bio-Hydration Research Lab,
> Inc.)
>
>
> By:_____
> Name:
> Title:

## EXHIBIT 6.2 TO NOTE PURCHASE AGREEMENT

## FORM OF ADVANCE REQUEST

ADVANCE REQUEST

Date: [_____]


TO:    The Administrative Agent under
       the Agreement referred to below

Dear Sir or Madam:

Reference is made to the Note Purchase Agreement dated as of June 28, 2007, executed by and among Penta Water Company, Inc. (formerly known as Bio-Hydration Research Lab, Inc.), a California corporation (the *"Company"*), the Administrative Agent named therein, and the Purchaser or Purchasers named therein (together with all amendments, supplements, restatements, modifications, replacements, extensions and rearrangements thereof, the *"Agreement"*).   Capitalized terms used herein but not defined herein shall have the meaning assigned such terms in the Agreement.

Pursuant to the terms of the Agreement, the Company hereby requests an advance (the *"Advance"*) from the Purchaser or its designee under the Agreement in the amount of $[_____], which the requested funding date of such advance being [_____].

The proceeds of the Advance shall be (a) used for the purposes described on Schedule A hereto and (b) wired to the accounts listed on Schedule B hereto.

The conditions to Closing set forth in Section 5 and 6 (as applicable) have been satisfied. In the case of an Advance that is a Subsequent Advance, the conditions set forth in Section 6.7 of the Agreement have been satisfied.

The undersigned certifies that he or she is the _____ of the Company and that as such, he or she is authorized to execute this Advance Request on behalf of the Company.

The undersigned further certifies, represents and warrants on behalf of the Company that the Company is entitled to receive the requested Advance under the terms and conditions of the Agreement.

Very truly yours,

**PENTA WATER COMPANY INC.**
(formerly known as Bio-Hydration Research Lab, Inc.)


By:_____
Name:
Title:

SIGNATURE PAGE TO
ADVANCE REQUEST

## SCHEDULE A TO ADVANCE REQUEST

### <u>Use of Proceeds</u>

The proceeds of the Advance will be used as follows:

| Purpose | Amount |
|---------|--------|
|         |        |
|         |        |
|         |        |

SCHEDULE A TO
ADVANCE REQUEST

## SCHEDULE B TO ADVANCE REQUEST

### Wire Transfer Instructions

The proceeds of the Advance will wired (or netted) as follows:

| Purpose | Amount | Wire Transfer Instructions (if applicable) |
|---------|--------|-------------------------------------------|
|         |        |                                           |
|         |        |                                           |
|         |        |                                           |

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 153396    — TC**

**July 25, 2008
16:04:34**

**Civ Fil Non-Pris**
USAO #.: 08CV1350
Judge..: LARRY A BURNS
Amount.:                    $350.00 CK
Check#.: BC

**Total-> $350.00**

FROM: 08CV1350

ORIGINAL

JS 44 (Rev. 12/07) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

PLAINFIELD DIRECT INC., a Delaware corporation, and CUNEO CAPITAL PARTNERS I, LLC, a Connecticut limited liability co.

**(b)** County of Residence of First Listed Plaintiff   Delaware,Connecticutt

(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Katherine Huang, Munger, Tolles & Olson, 355 South Grand Ave., 35th Floor, Los Angeles, CA  90071-1560

**DEFENDANTS**

'08 CV 1950 LAB NLS

FILED
08 JUL 25 PM 3:59
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY:    DEPUTY

County of Residence of First Listed Defendant   San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 365 Personal Injury - Product Liability | ☐ 830 Patent | ☐ 480 Consumer Credit |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 630 Liquor Laws | **LABOR** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 710 Fair Labor Standards Act | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 720 Labor/Mgmt. Relations | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 740 Railway Labor Act | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 385 Property Damage Product Liability | **SOCIAL SECURITY** | ☐ 790 Other Labor Litigation | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | **PRISONER PETITIONS** | ☐ 861 HIA (1395ff) | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 862 Black Lung (923) | | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | **Habeas Corpus:** | ☐ 863 DIWC/DIWW (405(g)) | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 530 General | ☐ 864 SSID Title XVI | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 865 RSI (405(g)) | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332

Brief description of cause:
Breach of contract, open book account, account stated, money lent or paid

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $
$3,000,000 plus interest

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):

JUDGE                    DOCKET NUMBER

DATE  7/25/08

SIGNATURE OF ATTORNEY OF RECORD  Katherine Huang

**FOR OFFICE USE ONLY**

RECEIPT # 153346    AMOUNT $350    APPLYING IFP    JUDGE    MAG. JUDGE

JAC  7/25/08